MANSHIP et al. v. NEW SOUTH BUILDING & LOAN ASS'N et al.

(Circuit Court, S. D. Mississippi. July 27, 1901.)

**1. BUILDING AND LOAN ASSOCIATIONS—ORGANIZATION—LOUISIANA STATUTES.**
A building and loan association may be organized under the general incorporation statute of Louisiana, which authorizes the formation of corporations for the purposes enumerated (Rev. St. § 683), "and generally for all works of public utility and advantage," and may assume and exercise the powers usually incident to such associations, and its contracts with its members are governed by the law applicable generally to such contracts.

**2. SAME—POWERS—BORROWING MONEY.**
The fact that a building and loan association assumes by its charter, and exercises, the power to borrow money and execute notes therefor, or to issue different classes of stock, does not affect its character as a building and loan association; such powers being within those it may properly exercise, in the absence of any statutory restriction.

**3. SAME—BORROWING MEMBERS—ESTOPPEL TO DENY CHARACTER OF ASSOCIATION.**
One who deals with a corporation as a building and loan association, becoming a stockholder and a borrower from it, is estopped to deny its character as such an association to avoid liability on his contract.

**4. SAME—CONSTRUCTION OF CONTRACT—USURY.**
A borrowing member of a building and loan association sustains a dual relation to the association, as an investor in and borrower from the same, and where he is of full age and compos mentis a court is not justified in arbitrarily applying premiums and stock payments to the liquidation of his debt, contrary to the terms of his contract, nor in arbitrarily combining premiums and interest charges in order to constitute usury, ignoring the plan upon which such associations are conducted and the relations between the parties with reference thereto, and treating such relations as those simply of borrower and lender.

**5. SAME—CHARGING FIXED PREMIUMS—LEGALITY.**
The fact that the premium charged by a building and loan association from borrowing members is fixed by its by-laws, and is uniform in all cases, instead of by competitive bidding in each case, does not authorize such premium to be treated as interest, for the purpose of rendering the contract usurious, in the absence of any governing statute. Uniform premiums are in fact more equitable, as between the borrowing members, than those determined in each case by the necessities of the borrower.

**6. SAME—LAW GOVERNING CONTRACTS—DESIGNATED PLACE OF PERFORMANCE.**

Where the by-laws of a building and loan association provide that all money due from members of the association, or from it to the members, shall be payable at its home office, in the state where it is organized, and all its contracts contain similar provisions, such contracts are solvable in the state of the home office, and governed by its laws, although notes and mortgages given by borrowing members may be executed in other states, and such members are permitted for their own convenience to make payments to local agents appointed by the association, who are, for the purpose of receiving and forwarding such payments, made by the by-laws the agents of the members.

**7. FEDERAL COURTS—FOLLOWING STATE DECISIONS—QUESTIONS OF GENERAL LAW.**

What law governs a contract between a building and loan association and a borrowing member, where the member resides in another state and the mortgaged property is there situated, and whether such contract is usurious, when that depends upon whether it is solvable under the laws of that state or those of the state in which the association is domiciled, are questions of general commercial law, upon which a federal court is not bound to follow the decisions of the courts of the state, but is governed by those of the superior federal courts.[1]

**8. CORPORATIONS—INSOLVENCY—SETTLEMENT WITH STOCKHOLDERS.**

Where the affairs of an insolvent building and loan association are to be wound up in a federal court in the state of its domicile, the rule adopted by that court for accounting and settlement between the receiver of the corporation and its borrowing stockholders will be followed by a federal court of another district, which has appointed an ancillary receiver.

In Equity. Suit against an insolvent building and loan association by a borrowing stockholder, and cross bill by receiver for foreclosure of mortgage.

Sterling & Harris and Frank Johnston, for complainants.
Denegre, Blair & Denegre and J. S. Sexton, for defendants.

NILES, District Judge. Complainants herein filed a bill against the New South Building & Loan Association, Johnston Armstrong, receiver therefor, and Jules A. Blanc, trustee in a certain deed of trust hereinafter referred to, and alleged, among other things, that Luther Manship and his wife, Belmont P. Manship, borrowed from said association the sum of $1,000 on the 7th day of December, 1894, and that in order to secure the same they executed a deed of trust of that date to said Jules A. Blanc as trustee to secure said association in the sum of money so borrowed upon real estate situated in the city of Jackson, Miss. They further alleged that said loan was "evidenced by the joint promissory note of Luther Manship and Belmont P. Manship, payable on the ——— day of October, 1906, to the order of said association, at its office in the city of New Orleans, La."; that said association is a nonresident of this state, and that on the ——— day of ———, 1899, it was placed in the hands of Johnston Armstrong as receiver of the United States circuit court for the Eastern district of Louisiana, and that later said receiver was appointed in ancillary proceedings had in the United States circuit court for the Southern district of Mississippi; that

[1] State laws as rules of decision, see notes to Griffin v. Wheel Co., 9 C. C. A. 548; Wilson v. Perrin, 11 C. C. A. 71, and Hill v. Hite, 29 C. C. A. 553.

said Armstrong was about to make an attempt to collect the sum of money so borrowed, with a lot of usurious interest and extortionate charges claimed to be due by him, and that he insisted upon the payment of "interest," "dues," and "premium," all of which are synonymous and aggregated 12 per cent. interest to start with and a correspondingly increasing ratio as each payment was made by complainants; that the contract entered into between the parties was usurious, because "it reserves 6 per cent. per annum interest and 6 per cent. per annum fixed premium," and that the term "premium" is used merely as a disguise for the word "interest," and that the whole is in excess of the 10 per cent. maximum allowed by the law of the state of Mississippi; that the contract "was made at Jackson, Miss., between complainants and the agent of the defendant association, and the amount of the loan so paid to complainants at Jackson, Miss., and it was the express agreement and understanding of all the parties to the transaction, at the time of making it, that said contract was to be performed by complainants making certain monthly payments to the local agent of said defendant association at Jackson, Miss., and that, as a matter of fact, it was never intended that said note should be paid at New Orleans, or at any other place than at Jackson, Miss.."; that said association "was engaged in the ostensible business of a building and loan association, which served as a cloak for its nefarious operations and practice of usury in the state of Mississippi," and that, as a matter of fact, it was not a building and loan association at all, but "was simply a money-lending concern, using the guise of a building and loan association, with complicated and intricate form of contract, merely to hide its illegal and shady transactions, and that none except holders of the guaranty stock were allowed to have any voice at all in the management of the affairs of said corporation, and that, as borrowers, complainants were not members of a building and loan association, but debtors to a lot of money sharks, and that none of the benefits of a bona fide building and loan association could possibly inure to them from their membership in this concern"; that the by-laws of the association were made a part of the contract of loan, and that the premiums charged were fixed therein without legislative authority therefor, and that said premiums were therefore illegal, and were in fact interest. Complainants further alleged their willingness to do equity in the premises, and offered to pay into court "whatever amount that may seem right to the court that they should pay," and that said receiver threatened to foreclose said mortgage and thereby collect a lot of illegal charges, and that said mortgage constituted a cloud upon the title of complainants. Wherefore complainants ask that said receiver be restrained "from attempting to foreclose the mortgage on said property of complainants until the matter has been fully inquired into and adjudicated by this court."

The defendants answered said bill, denying the allegations that the contract was usurious, and that the words "interest" and "premium" were synonymous, and in fact denied that there was any premium provided for in the contract between the parties. They

further denied that said contract was made at Jackson, Miss., and alleged that, while the note and mortgage were executed in Jackson, Miss., it was done for the convenience of the said Luther Manship and his wife, and denied that there was any understanding that said contract was to be performed by complainants making certain monthly payments to the local agent of said association at Jackson, Miss., and that as a matter of fact it was never intended that said note should be paid in New Orleans, or at any other place than at Jackson, Miss., and stated that, "in reference to the allegations as to payments made at Jackson, Miss., defendants say, as a matter of convenience to local borrowers at Jackson, Miss., they were allowed to make their payments to one George Green, and such payments as were made by Luther and B. P. Manship on said loan were made to him, but that it was expressly agreed by the parties that such payments were made to such party as the agent of the said Luther and Belmont P. Manship, and not as the agent of the defendant association." Section 5 of article 3 of the by-laws of the defendant association is expressly made a part of the contract between the said Luther and B. P. Manship and the said defendant association, and expressly provides that "all money due from members to the association or from it to the members shall be payable at the home office in New Orleans, La." The defendants denied all allegations to the effect that the New South Building & Loan Association was anything more or less than a regular building and loan association, and that it was "using the guise of a building and loan association to hide its illegal and shady transactions" by which usury was extorted from the people of Mississippi, and denied "that a fixed premium, which, added to the rate of interest charged in a building and loan contract, exceeds the legal rate of interest charged or permitted to be charged in Mississippi, necessarily makes such contract with a Mississippian usurious."

The defendant Johnston Armstrong, receiver, made his answer a cross bill against the complainants, alleging that he was a citizen of Louisiana, and that said association was likewise a citizen of that state; that it was organized as a building and loan association under and by virtue of the general and special laws of that state, and that subsequent to its organization it adopted certain by-laws; that during the active operation of said association said Belmont P. Manship made a written application for membership therein and subscribed for ten shares of the stock of said association, and that she was admitted into membership in said association "subject to all the conditions and limitations contained in the charter and by-laws of said association"; that subsequent thereto she made application in writing for a loan, which application was accepted; that she and her husband, Luther Manship, executed the note and deed of trust referred to in complainants' bill. The complainant in said cross bill further alleged that said New South Building & Loan Association became insolvent in June, 1899, and that it became impossible and impracticable for it to further carry on its business; that one of the stockholders filed a bill in the circuit court of the United States for the Fifth circuit and Eastern district of Louisiana,

praying that a receiver be appointed to take charge of said association and wind up its affairs; that service on said bill was accepted by said association, and upon presentation of the same to the Honorable Don A. Pardee, circuit judge in and for said Fifth circuit, he (the said Johnston Armstrong) was duly appointed receiver of the association; that he had qualified as such under the original order appointing him, and by proper ancillary proceedings he was likewise appointed receiver by the United States circuit court for all of the districts of Louisiana, Mississippi, Georgia, and Florida, and that he was proceeding to administer the estate in each of said states, subject to the direction of the courts which had appointed him; that upon taking charge of the property and affairs of said association he found that it was necessary to seek the direction of the court appointing him, in order that there might be a homogeneous, uniform, and equitable administration of the affairs of said association throughout the states wherein he had been appointed receiver, and he applied to the court of primary jurisdiction, which was presided over by the Honorable Charles Parlange, United States district judge for the Eastern district of Louisiana, for directions in the premises; that such application was referred to the Honorable E. B. Kruttschnitt as master and commissioner in chancery, who, after a thorough investigation into the affairs of said association, "submitted his findings and recommendations in the premises to the court appointing him"; that said report was excepted to, but was confirmed by the court appointing him; that an order was made by said court directing said receiver as to the method of settlement to be made with all of the borrowing members of said association; that he had been directed to sue in all cases where such method of settlement was rejected; that he had notified complainants of this method of settlement, and that they declined to be bound thereby, and he therefore asked by his cross bill that defendants thereto be required to settle according to the method of settlement which the receiver was directed to make in the premises, and that the deed of trust given by the said Luther and Belmont P. Manship be foreclosed. The receiver filed as exhibits to his cross bill the charter and by-laws of said association, the application for membership, certificate of stock issued thereon, the note and deed of trust executed by said Luther and Belmont P. Manship, a copy of the original bill under which he was appointed receiver and the order thereon, the report of the master and commissioner in chancery and the order of the court thereon, and asked that each be taken and considered as a part of his cross bill.

Complainants in the original bill answered said cross bill, and filed an amended bill, which was in turn answered by the defendants to the original bill; the principal points urged in said amended bill being a repetition of the original bill, with the further allegation that the defendant association, while a solvent, going concern, had borrowed the sum of $137,000 to loan to prospective borrowers, and that, "as borrowing money to loan is no part of the functions of a building and loan association," complainants allege that said association was organized as a money-lending concern, pure and simple,

and, if such corporations are building and loan associations, then any body of men can organize, secure a charter, call themselves a build- .ing and loan association, lend money at usurious rates of interest, and by issuing stock in said association escape the usury laws in the various states in which they do business. It is further alleged in said amended bill that the issuance of stock by the said association and taking stock subscriptions were merely fictions to cover the usurious character of the transaction, and that all payments made by complainants in the original bill, whether upon stock or otherwise, should be credited on the $1,000 originally borrowed, and that said complainants ought not to be held or considered as members of a building and loan association at all, because of their want of authority to participate in its affairs, and that said association had no authority to issue the class of stock issued to complainants, or to issue stock at all, for that matter. The equities of the amended bill are all de- nied, and thus the parties reached an issue.

The proof submitted in the case shows that said association nego- tiated $137,000 of its bonds, and that the money realized from the sale of said bonds, together with other money in the "loan fund" of the association, was loaned to borrowing members of said asso- ciation; that there was a local board of said association at Jackson, Miss., as provided for in the by-laws of said association, and that the application for the loan made by Belmont P. Manship was ap- proved by said local board and forwarded to the home office at New Orleans, La., "whose duty it was to pass upon applications for loans, and to either reject or approve the same, in whole or in part, ac- cording to its judgment"; that, upon the approval of the applica- tion for said loan by the loan committee at the home office, the note and deed of trust were prepared by the general attorney of the association at New Orleans, and a check was drawn by the presi- dent and treasurer of said association in favor of Belmont P. Man- ship on the bank in New Orleans, La., with which said association was then doing business. "All of these papers were then forwarded to T. J. Wharton, an attorney at law at Jackson, Miss., who was designated by said association to prepare the abstract of title to loans described in Exhibit E, and, upon the execution by the said Belmont P. Manship of said note and deed of trust, said check was turned over to the said Belmont P. Manship by the said T. J. Whar- ton at Jackson, Miss." All payments ever made by the said Bel- mont P. Manship and her representatives were made either to George Green or to Alexander Montgomery, at Jackson, Miss. These parties were selected by the agent of the defendant associa- tion as the proper parties to receive said payments, and when so re- ceived they entered the same in the pass book furnished said Bel- mont P. Manship by the association, and in remitting said moneys said Green and Montgomery reserved a commission of 1 or 2 per cent. for their trouble. All of the exhibits filed with the pleadings or evidence in the cause were admitted to be true. It was shown that the membership of said association "consists of what are known as borrowing and investing members,—the borrowing members be- ing such as procured loans from said association, and the investing

members being those who invested in the stock thereof"; that the members of said association were scattered throughout the states of Georgia, Alabama, Louisiana, Mississippi, Virginia, Tennessee, and elsewhere; that since the appointment of the receiver he had proceeded under the directions given by the decree made by Judge Parlange, which gave specific directions in reference to the method of settlement to be made by the borrowing members of said association, and that he had collected something like $200,000 from the borrowing members of said association on that basis, of which $35,000 had been paid by the borrowing members of the association in Mississippi, and about $111,000 had been paid by the borrowing members of the association in Louisiana; that, while said association was able to meet its outstanding bonds and scrip, it was unable to meet its obligations to the members of said association, and was therefore insolvent; that a majority of the stock of said association is held by the investing members of said association; that notice of the method of settlement directed to be made by said Judge Parlange was mailed to Luther P. Manship, and was received by him in due course of time.

The foregoing statement of the evidence is not intended to be exhaustive, but all the evidence in the case has been duly considered by the court, and that above mentioned, in connection with the pleadings and exhibits filed in said cause, constitutes the material portion of the evidence in the case. This case has been learnedly and exhaustively presented by able counsel, who have filed elaborate briefs and made oral arguments on both sides of the question, and the labor of the court has been materially lessened thereby. In view of the fact that there are over 100 cases pending in the courts over which I preside in Mississippi, involving the same or kindred questions to those here presented, I have tried to give the questions presented as thorough investigation as possible, and have concluded to present my views thereon in writing. The material questions presented to the court may be put under the following heads: First. Is the defendant a building and loan association under the law, and are its contracts with its members to be treated as building and loan association contracts in determining the rights of the parties thereto? Second. Is the contract between the parties hereto usurious? Third. What method of settlement would be equitable and just to all concerned?

I think there is no question that the New South Building & Loan Association is a regular building and loan association, and that all of its contracts with its members are to be dealt with as building and loan association contracts. This association was organized under and by virtue of the laws of the state of Louisiana. Under the laws of that state private corporations are organized principally under section 683 of the Revised Statutes. This section, after containing a general enumeration of the purposes for which corporations are organized, closes as follows: "And generally for all works of public utility and advantage." It has been held that the enumeration of the purposes for which corporations may be organized under this statute are exemplary and not exhaustive. See Glen v. Breard, 35 La. Ann.

875. Act No. 151 of the Acts and Resolutions of Louisiana of 1888, which was passed prior to the organization of the defendant associa- tion, specifically declares "that the terms 'public utility' and 'advan- tage' in Rev. St. § 683, and in all acts amendatory thereof, be held to include in their meaning the objects and purposes of homestead or building associations, societies, and companies as now established in this state." In view of this declaration of the legislature, there can be no question that building and loan associations are authorized to be incorporated under the general law of Louisiana, and the plan of incorporation of the defendant association, as shown by the charter, seems to conform to the statutes of that state in respect thereto.

The principal objections urged against treating the defendant asso- ciation as a building and loan association seem to be that under its charter and by-laws it is authorized to borrow money and to issue different classes of stock, and it is specially urged that the power to borrow money and to issue guaranty and fixed-maturity stock, or, in other words, stock which matures at a definite period, are incon- sistent with the building and loan association plan, and that any asso- ciation embodying and exercising such powers is not a building and loan association at all. I do not think that the power to borrow money and to issue different classes of stock, or the exercise of that power, deprives the defendant association of its character as a build- ing and loan association. The right of this association to issue its paper was raised in the case of William Gabler v. New South Build- ing & Loan Association, which was decided by the court of appeals in the state of Louisiana on March 27, 1898, and in that case it was held:

"A building and loan association is like any other corporation, and the powers, which are incident to corporate existence in other corporations, are incident to corporations of the character of the defendant corporation. Like any other private corporation, building associations may do all acts that may be necessary to enable them to exercise the powers expressly conferred and to accomplish the object for which they are created; and it is settled, in this country, at least, that in the absence of express restric-. tions every private corporation has the power to borrow money or otherwise incur debts."

This case is expressly followed by the supreme court of Mississippi in the case of Hundermark v. Association, 29 South. 528. In the latter case the question of the power of the association to borrow money was not raised, but its power to pass certain by-laws was raised, and that power had been upheld in the Gabler Case, in re- ferring to which Judge Terral, speaking for the court, used the fol- lowing language:

"We think it fitting and safe to follow the opinion of one of the superior courts of the state, construing its own statutes. It is also held in the same case that these identical by-laws are proper, necessary, and reasonable, and we concur in that conclusion."

Thompson on Building and Loan Associations, in section 118, states:

"One of the objects of building and loan associations being to loan money, it is essential for the best returns upon the money that the association

keep loaned all of its available money, and, if there be not sufficient money in the treasury to pay withdrawals or meet the proper obligations of the association, it becomes necessary that the association resort to its borrowing powers."

The same authority, in section 275, enters more fully into the subject, and closes the discussion of the power of building and loan associations to borrow money with the following statement: "This proposition is sustained by the weight of authority." In section 276 the author shows that the same rule is recognized by the English authorities.

In section 375 of Thornton & Blackledge on Building and Loan Associations, the authority of building and loan associations to borrow money is clearly upheld, and it is there stated:

"It is likewise an equally well acknowledged rule that the right to contract debts carries with it the power to give negotiable notes or bills in payment of or security for such debts."

In the case of Cook v. Association (Ga.) 30 S. E. 912, it was objected that because "the charter in this case gave this association the power to sell or hypothecate securities," etc., such association was not a building and loan association, and entitled to the immunities and privileges thereto; but such view was rejected by the court. In view of the business carried on by building and loan associations in the United States, it seems impossible that such an objection as this ought to prevail, even in the absence of authorities on the subject.

It is further insisted that a building and loan association has no power to issue different classes of stock to its members, and that the principle of strict mutuality incident to building and loan associations prohibits any such exercise of power. It appears from the by-laws of the defendant association that it had the power to issue different classes of stock, and it is therefore insisted that it is not a building and loan association. The stock issued in this particular case, as I understand it, was a class of stock known in building and loan parlance as "stock with a fixed maturity." The decisions on the right of a building and loan association to issue stock of this character are somewhat in conflict. In Investment Co. v. Alexander (C. C.) 96 Fed. 870, Judge Simonton upheld a building and loan contract where the maturity of the contract was guarantied to be within ten years from its date, and was not dependent upon the business or on the termination of the existence of the company. The same conclusion has been reached in several other decisions to which the attention of the court has been called, though in several cases it has been held that such fixed maturity was only an estimate of the time of the maturity of the stock, and that, if the association had the funds to pay it at the time of such maturity without impairing its obligations to the other members of the association, then the member holding such stock had the right to demand the immediate redemption thereof in cash; otherwise, he must wait until the earnings of the association matured his stock. I am of the opinion that building and loan associations are not required to issue the same class of stock to every member of the same, and that it is not a prerequisite to the existence of a building and loan association that every stockholder therein

shall have the same power as every other stockholder. I think that building and loan associations have a right to distribute their stock into such classes as will enable them to do business. That which is desirable for one might not be desirable for another, and, so long as the principle of mutuality obtains among the different members of the different classes into which the membership of the association is divided, I think the principle of mutuality is preserved. At any rate, and regardless of the correctness of these conclusions, it is certainly true that complainants in this cause, having dealt with the defendant association as a building and loan association and having borrowed its money, are now estopped to deny the character of the association, its power to contract, or their liability to it. In the case of Leahy v. Association (Wis.) 76 N. W. 625, the court reached the conclusion, after full consideration of the question, that after insolvency and dissolution of the building and loan association holders of such stock or contracts were estopped from denying their validity or denying that they were members of the corporation under the obligation to share equally with its members in the loss of the concern. See, also, the cases of Gibson v. Association (Ill. Sup.) 48 N. E. 580, 39 L. R. A. 202, and Johnson v. Association (Ala.) 28 South. 2, where it is held that a stockholder and borrower of a building and loan association is estopped from attacking the validity of certain classes of stock authorized by the by-laws and issued at the time he became a subscriber. See, also, Thomp. Bldg. Ass'ns (2d Ed.) p. 39, where it is stated:

"In an action by a building association to foreclose a mortgage for the nonpayment of dues by the borrower, it was held that the defendant could not defend the action on the ground that the association was a 'moneyed incorporation,' within the meaning of the statute, and that its charter, as such, before the commencement of the suit, had become void from its failing to comply with the provisions of the general statute, for it belongs to the state alone, by a proceeding for that purpose, to enforce the forfeiture, and that the association, until by a judicial sentence its charter was declared void, was a corporation de facto, and that no private person, dealing with it, could be permitted to say that it was not also a corporation de jure."

See Homestead Co., v. Linigan, 46 La. Ann. 1118, 15 South. 369, see End. Bldg. Ass'ns (2d Ed.) § 544; Thomp. Corp., § 6021.

In addition to the foregoing suggestions that the defendant association, in my judgment, was organized in conformity to the law of the state where it is domiciled, and that, whether this is true or not, complainants are estopped to raise any questions in respect thereto in this proceeding, said association, as before indicated, was treated as a building and loan association in the William Gabler Case, which is followed by the Hundermark Case; and it was also so treated in the able report of the master in chancery made by Mr. Kruttschnitt in the case of Miles v. Association, and by Judge Parlange in passing upon said report and entering a decree confirming the same, which report and decree were offered in evidence in this case. 111 Fed.

This brings me to the consideration of the question of whether the contract between the parties hereto is usurious, the consideration of which involves the scope and character of building and loan contracts, and also the question of whether this is a Louisiana or Mis-

sissippi contract. I am of the opinion that the contract is not usurious, and that it is a perfectly legal and valid contract. To enter at large upon the discussion of the principles upon which building and loan associations are founded would serve no useful purpose. It is enough to say that their contracts with their members have given rise to an enormous amount of litigation within the last few years, and some difference of opinion by the courts. I think a majority of the states of the Union recognize the validity of such contracts, and there is no doubt that the weight of authority is in favor of upholding what are known as building and loan contracts. Endlich, in his work on Building Associations, devotes over 20 pages, commencing with page 325 of his second edition, to a review of the various interpretations placed upon "the nature of loans or advancements in building and loan associations." Summing up the situation, this author, in section 365, used the following language:

"An examination of the foregoing decisions would seem to justify the conclusion that the clear weight of judicial authority declines to look upon the advancement between the building association and its advanced members as constituting a loan, pure and simple."

Hon. J. A. P. Campbell, chief justice of the supreme court of Mississippi, in delivering the opinion of the court in the case of Goodman v. Association, 71 Miss. 324, 325, 14 South. 147, uses this language on the subject of building and loan contracts:

"The vital principle of such associations, as known to us, is compounding monthly receipts, whereby to produce astounding results for the mutual benefit of all concerned, and what is called a fine (merely an agreed sum as liquidated damages) is imposed for every default in payment, so as not to derange the process of compounding, which must fail if there is any want of payment as agreed, and failure of which would cause failure of the scheme. We see nothing wrong in members of full age and compos mentis mutually binding themselves to so beautiful a scheme for reciprocal advantage, and being held to the performance of what they have agreed."

With this statement of the court I fully concur. Liberty to contract is one of the essential elements of freedom, and one of the most valuable rights incident to our institutions, and it is very difficult for me to see any reason in law or morals why a party desiring to become a member of a building and loan association may not do so, and if he desires that a part of his contributions shall be credited upon the amount borrowed by him, and that a part shall go to swell the loan fund of the association, to be loaned to his fellow members of the association, and in this way swell the profits and increase the value of his stock therein, and thereby hasten its maturity, I see no reason why he should not be permitted to do so, and why his contract might not be enforced according to his agreement; and, furthermore, I fail to understand what right the court, which may be called upon to enforce such contract, has to appropriate his stock payments or his payments of premiums in any other way than he agreed by his contract that they should be appropriated. In my opinion, the failure to recognize the dual relation which a borrowing member of a building and loan association sustains to the association as an investor in and a borrower from the same, and a further failure to recognize the rights of parties "of full age and compos mentis," as

Judge Campbell puts it, to enter into contracts and be bound thereby, have been the fruitful source of the various opinions of the courts of the country which have refused to recognize anything in the contract of a borrowing member from a building and loan association, except a loan of money pure and simple. The arbitrary appropriation of premiums and stock payments to the liquidation of the debt of a borrowing member of a building and loan association, or the arbitrary combining of premiums and interest charges in order to constitute usury in a contract which is plainly written and easily understood, in direct contravention of the undisputed terms of the contract, is unjustifiable.

I do not overlook the fact that some of the books and some of the courts hold that, when the premium is fixed by the association and not ascertained by public bidding for the loan, it is to be treated as interest and renders the contract usurious. You will find such a statement of the law in End. Bldg. Ass'ns (2d Ed.) § 409. In support of this doctrine the author refers to Bates v. Association, 42 Ohio St. 655, which turned, doubtless, upon a statute of the state of Ohio (section 2 of the Act of May, 5, 1868, as amended May 9, 1868), which reads:

"Such corporation shall be authorized and empowered to levy, assess and collect from its members such sums of money, by rates of stated dues, fines, interest on loans advanced, and premiums bid by members or depositors for the right of precedence in taking loans, as the corporation by its by-laws shall adopt." 65 Ohio Laws, p. 174.

In this case there was no competitive bidding, and the court uses this language:

"The premium named in the note is unlike the premium named in the statute. It was not measured or ascertained by competitive bidding among the members and depositors, as we understand the statute to require."

From the foregoing quotation it seems to me clear that the case does not support the statement of the author. In section 364 of the same authority, the same case is quoted to support the position that:

"The statute in Ohio is the exact measure of legitimacy and binding extent of the contract. Only under the statute can it be enforced, and only so far as it is in accordance with the statute."

The supreme court of Mississippi followed the misleading statement of the law found in Endlich on Building Associations in reference to the effect of "fixed premiums" upon building and loan contracts in Sokoloski v. Association, 77 Miss. 164, 165, 26 South. 361, and that doctrine, though there is no similar statute to the one quoted from Ohio in this state, seems now to be thoroughly established in Mississippi; but I decline to follow the Sokoloski Case, and other cases following it, in this particular, because in my judgment the court in that case was misled by the statement of an author who did not find any support for the doctrine announced by him in the authority to which he referred. In my judgment, when there is no legislative prohibition, such as is found in Ohio, premiums may be fixed by contract, just as interest may be fixed thereby, and it seems to me certain that, in view of the present extent of building and loan association interests in the United States, fixed premiums are better calculated

to put all the members of such associations on an equal footing than premiums fixed by open bidding, where the amount of same would not be fixed upon any business basis, but would only be determined by the financial exigencies and necessities of those who might be bidding for the particular sum of money offered. In view of the facts of this case and subsequent findings herein, it was not necessary for me to enter into the discussion of this feature of the case; but, as it was raised by the pleadings, I have concluded that it would be well enough to dispose of it.

I now come to the consideration of whether the contract between the parties hereto is a Louisiana or a Mississippi contract. I think it clear that the contract is solvable in Louisiana, and that it is to be governed by the laws of Louisiana. It is true that it is alleged in the bill in this cause that the contract was made payable in Louisiana for the fraudulent purpose of evading the usury laws of the state of Mississippi; but this allegation is specifically denied, and not only does the proof fail to sustain it, but all the circumstances surrounding the transaction seem to me to reach the opposite conclusion. This building association was organized in Louisiana, and its principal place of business was in New Orleans, La. It contemplated doing business in several states, in which the rates of interest vary in amount. The promoters of the organization and the officers of the same all lived in the state of Louisiana, and it was just as natural as it was prudent for Louisiana to be selected as the place where such contracts were to be paid. It would have been remarkable, and something out of the ordinary course of business affairs, if some one place of payment had not been fixed, and if that one place had been fixed elsewhere than where the home office was located and officers of the association resided. Section 5 of article 3 of the by-laws of said association provides:

"All money due from members to the association, or from it to the members, shall be payable at the home office in New Orleans, La."

The note given by Belmont P. Manship and Luther Manship on its face shows that it was payable to the defendant association "at their office in the city of New Orleans, La." The deed of trust given to secure the same recites the fact that said note is payable to the order of said New South Building & Loan Association at their office in the city of New Orleans, La. The subscription to stock signed by Belmont P. Manship provides:

"Agents are not allowed to collect admission fees. Same must be forwarded to the home office direct by the applicant; all other payments to be made to the home office."

It is true that it was provided by section 4, art. 8, of the by-laws of said association, that:

"Members may, if they so desire, make monthly payments on stock to the local treasurer; but such local treasurer shall be deemed to be the agent of the members, and not of the association."

It is further true that the evidence in this case shows that all payments made on this debt were made at Jackson, Miss., to parties selected by the defendant association to collect and remit the same.

I am unable to see how this proves that the contract is a Mississippi contract. To put themselves in an attitude to do business in competition with local building and loan associations, it was necessary to make some arrangement for collections and remittances; and the local arrangement so made was the simple outgrowth of the situation, and does not conflict with the general provisions of the contract that the same should be solvable in the state of Louisiana. There can be no doubt that the contract between the parties hereto would be enforced as written in the state of Louisiana. See Homestead Co. v. Linigan, 46 La. Ann. 1118, 15 South. 370; Richard v. Association, 49 La. Ann. 481, 21 South. 643. I believe it is admitted that the contract between the parties hereto would be enforced in Louisiana; and it being, in my judgment, a Louisiana contract, it should be enforced elsewhere.

It is urged upon the court that the supreme court of Mississippi is committed to the doctrine that contracts similar to this are Mississippi contracts, and that this court should follow that court. The cases of Sokoloski v. Association and of Shannon v. Association, 30 South. 51, are cited, and this court is urged to follow the same. The question, in my judgment, is one of general jurisprudence and commercial law, in respect to which the decision of the state court, however much it may be respected, is not binding upon this court, and cannot be followed when this court, in the exercise of an independent judgment, reaches a different conclusion. The contention that federal courts should follow state courts generally grows out of the provisions of the judiciary act found in Revised Statutes of the United States, § 721, which provides:

"The laws of the several states, except where the constitution, treaties or statutes of the United States otherwise require or provide, shall be regarded as rules of decision in trials at common law in the courts of the United States in cases where they apply." •

In Swift v. Tyson (decided in 1842) 16 Pet. 1, 10 L. Ed. 865, the question involved was whether a pre-existing debt constituted such a valuable consideration as to make a transferee of commercial paper a holder for value. The federal court disregarded the decision of the courts of last resort in the state of New York, in which the contract was made and became payable. Justice Story, in delivering the opinion of the court, used the following language:

"In the ordinary use of language, it will hardly be contended that the decisions of the courts constitute laws. The laws of a state are usually understood to mean the rules and enactments promulgated by the legislative authority thereof, or long-established local customs having the force of laws. And we have not the slightest difficulty in holding that this section, upon its true intendment and construction, is strictly limited to local statutes and local usages of the character before stated, and does not extend to contracts and other instruments of a commercial nature, the true interpretation and effect whereof are to be sought, not in the decisions of local tribunals, but in the general principles and doctrines of commercial jurisprudence."

See, also, Oates v. Bank, 100 U. S. 239, 25 L. Ed. 580; Phipps v. Harding, 17 C. C. A. 203, 70 Fed. 469, 30 L. R. A. 513; Watson v. Tarpley, 18 How. 517, 15 L. Ed. 509; Brooklyn City & N. R. Co. v. National Bank of the Republic, 102 U. S. 14, 26 L. Ed. 61; Bank

of Edgefield v. Farmers' Co-op. Mfg. Co., 2 C. C. A. 637, 52 Fed. 98; Butz v. City of Muscatine, 8 Wall. 575, 19 L. Ed. 490.

The law of the place of performance of a contract is purely a commercial question, and the federal courts have disregarded the state courts on that question in the following cases: Hartford Fire Ins. Co. v. Chicago, M. & St. P. R. Co., 17 C. C. A. 62, 70 Fed. 201, 30 L. R. A. 193; Andruss v. Association, 36 C. C. A. 336, 94 Fed. 575 (referred to hereafter in this opinion); Brower v. Insurance Co. (C. C.) 86 Fed. 748; and Association v. Logan, 14 C. C. A. 133, 66 Fed. 827. I don't think it can be contended that the ruling of the supreme court of this state (Mississippi) in the Sokoloski Case, that a fixed premium rendered the contract usurious, or in the Shannon Case, that the contract in that case was a Mississippi contract, are founded upon any "rules or enactments promulgated by the legislative authority of the state" or upon "long-established local customs having the force of laws."

In the case of Brown v. Freeland, 34 Miss. 181, the court announces the rule applicable to cases similar to this in the following words:

"When a contract is made in one country, to be performed in another, the law presumes, in the absence of any other circumstance, that the parties contracted with reference to the place where it is to be performed; and in that case the contract, as to its nature, construction, and validity, will be governed by the lex loci solutionis."

On this subject see, also, the case of Bennett v. Association, 177 Pa. 233, 35 Atl. 684, which seems directly in point; Nickels v. Association (Va.) 25 S. E. 8; Association v. Ashworth (Va.) 22 S. E. 521; Association v. Vance, 27 S. E. 274, decided by the supreme court of South Carolina at the November term, 1896; Turner v. Association (S. C.) 27 S. E. 947; Loan Co. v. Cannon, 96 Tenn. 599, 36 S. W. 386; Ware v. Investment Co., 29 S. E. 744, decided by the supreme court of Virginia, March 17, 1898.

The foregoing decisions all bear directly upon the question under consideration, and are in conflict with the decision of the supreme court of Mississippi in the Shannon Case. There are three other decisions on the same subject, two of which have been rendered by the circuit court of appeals for this circuit, and one by the supreme court of the United States, which state the law as I understand it to be, and which I am bound to follow. The first case is that of Andruss v. Association, 36 C. C. A. 336, 94 Fed. 575, on appeal from the circuit court of the United States for the Northern district of Texas. That case arose on a bill in equity to foreclose a mortgage. The association was incorporated under the laws of New York, where it had its original office and headquarters. It had procured a permit from the secretary of the state of Texas to do business in that state, as it was required to do by the law of Texas. Andruss applied to said association for a loan, and 30 shares of stock of the association were issued to him. By the terms of his contract with the association Andruss was to pay $30 of the principal of the debt of $3,000, $12.50 interest, and $12.50 premium each month, until the maturity of his shares of stock should cancel his indebtedness. The by-laws of the association and deed of trust and bond executed by

Andruss all provided that his payments should be made to the secre-. tary of the association at its domicile in New York. The defendant in this case pleaded usury and credit for all money which he had paid on account of subscription to stock in said association. Judge Shelby, delivering the opinion of the court as to the law by which the loan contract was to be governed, and on the defense of usury, and on the claim of the borrower to be credited with amounts paid on account of stock subscribed, said:

"The debt which is the subject of this suit is proved by a bond which is secured by a mortgage. The appellants, who are the obligors of the bond and the mortgagors in the mortgage, are citizens of Texas. The appellee, who is the obligee in the bond and the mortgagee in the mortgage, is a New York corporation. Both the bond and the mortgage are made payable at Geneva, in the state of New York. The by-laws of the appellee corporation provide that all payments shall be made to the secretary of the association at Geneva, N. Y. The appellee is a building and loan association, organized pursuant to the statutes of the state of New York, and both the bond and the mortgage contain a stipulation that it is to be governed by the laws of that state. In view of all these facts, we hold that the contracts in question are not usurious, if they are valid under the laws of the state of New York, the place of performance. Andrew v. Pond, 13 Pet. 65–79, 10 L. Ed. 61; Association v. Logan, 14 C. C. A. 133, 66 Fed. 827; Miller v. Tiffany, 1 Wall. 298, 17 L. Ed. 540; Sturdivant v. Bank, 9 C. C. A. 256, 60 Fed. 730; Dugan v. Lewis, 79 Tex. 246, 14 S. W. 1024; Association v. Tinsley (Va.) 31 S. E. 508. While it is true, as claimed by appellants, as a general proposition, that contracts in New York for more than 6 per cent. interest are usurious and void, yet an exception is made by statute of building and loan associations, or at least it is provided that premiums for loans may be paid such associations without a violation of the usury laws. This statute prevents the contract between the parties from being usurious under the general statutes. Association v. Read, 93 N. Y. 474. The claim of the appellant, George W. Andruss, that he is entitled to credit on his bond for borrowed money on account of the payments he made on his subscription for stock, cannot be sustained. He was a subscriber for stock in the association, and he was under contract to pay for it, just as any other stockholder."

It will be observed in this connection that the defenses interposed in this case would have prevailed under the decisions of the supreme court of Texas, and that the federal court declined to follow the ruling of the state court in such cases.

The case of Hieronymus v. Association (C. C.) 101 Fed. 12 is as near the exact counterpart of the case in hand as it is possible to conceive. There is a bill for an accounting and a charge of usury and a prayer for cancellation, just as in this case. A party in Alabama borrowed money from a New York building and loan association, agreeing to pay the principal sum at the home office in New York City. He gave a mortgage on lands in the state of Alabama, and dealt with Clark, the local collector, just exactly as complainants did with Green and Montgomery in this case. The by-laws provided for payments to a local collector, just as the by-laws in this case did. The allegations of the bill were that the contract was made payable in New York to avoid the usury laws of the state of Alabama, just as it is alleged in this case. The contract would have been usurious under the laws of Alabama, but was not usurious under the laws of the state of New York. The premium named in the contract was fixed by the association, and not by open bidding. Judge Toul-

min upheld the contract as valid, and in the course of the decision used the following language:

"If there is one thing which, more than another, public policy requires, it is that men of full age and competent understanding shall have the utmost power of contracting, and their contracts, when entered into freely and voluntarily, shall be held sacred, and be enforced by courts of justice."

In passing upon this decision, the circuit court of appeals of this circuit, in an opinion delivered April 9, 1901 (107 Fed. 1005), affirmed the decision and expressed its appreciation of the accuracy with which the law was stated by Judge Toulmin. In passing upon the question of a fixed premium, Judge McCormick, delivering the opinion of the court, said:

"The New York statute governing building and loan associations does not provide the manner or the mode of making loans to members of such associations, or of fixing the premiums to be paid by them; but it does provide that any premiums for loans made to such members shall not be deemed a violation of the provisions of any statute against usury. Andruss v. Association, 36 C. C. A. 336, 94 Fed. 575; Association v. Read, 93 N. Y. 474. If the statute had provided for the manner or the mode of fixing the premiums to be paid, and such mode had not been followed, then the premium would have been unlawful. Douglass v. Kavanaugh, 32 C. C. A. 107, 90 Fed. 375. By the terms of the contract providing for the payment of dues, premium, and interest, as the same is shown in the bill, the complainants are not entitled to the cancellation of the mortgage after paying such charges for a period of seven years; it not appearing that complainants' shares of stock are fully paid."

The supreme court of the United States, in the very recent case of Bedford v. Association, 21 Sup. Ct. 597, 45 L. Ed. 834, has, for the first time, so far as I am advised, passed upon a case which, in every essential feature, is parallel with the case in hand. In that case the contract was made between a citizen of Tennessee and a New York building and loan association. The premium was fixed by the association, and not by open bidding. There was a "soliciting agent in Memphis, Tenn., whose duty it was to solicit persons to become members of the association and subscribe for stock." There was a "local board" in Memphis, Tenn., and all applications were forwarded by the local soliciting agent, and had to be "accompanied by a recommendation of what was called the local board in regard to the wisdom of the loan. * * * The local board had officers, one of whom was a treasurer, through whom members might, if they desired, forward payments due to the association; but the by-laws stated that in so doing the local treasurer was acting as the agent for the stockholders, and not for the association." The by-laws and contract provided that payments should be made in New York. The contract was usurious under the laws of Tennessee, but not so under the laws of the state of New York. The statutes of Tennessee provide that premiums shall be fixed in "open meeting" and the money shall go to the highest bidder. See Mill. & V. Code, § 1751. Upon this state of facts the court held that the contract was not usurious, and should be enforced, using the following language:

"It is claimed, however, that, if the transactions between Bedford and the association were otherwise legal, they were affected with usury, and to the extent that they were usurious they were unenforceable. The contention is

that in making the loan of $4,600 Bedford was required. to pay a fixed premium of $460, and received only $4,140, and that this constituted usury in Tennessee. This is made out because, it is said, Bedford was required to withdraw his stock and receipt in full, and could therefore get no benefit from future profits of the association, and it is asserted that thereby the loan became 'fixed and certain, and no element of contingency' remained, and the transactions are withdrawn from the principle expressed in Spain v. Hamilton, 1 Wall. 604, 17 L. Ed. 619, that 'where the promise to pay a sum above legal interest depends upon a contingency, and not upon the happening of a certain event, the loan is not usurious.' But the fact was not as asserted. The stock was pledged as security for the advance; and the pledge was no more a withdrawal of the stock, terminating Bedford's ownership of it, than his mortgage was an absolute conveyance of his land. It is provided in section 3, art. 19, that in addition to real estate security for a loan a shareholder shall 'transfer in pledge to the association one share of stock held by said shareholder as collateral security on all loans made by the association to him.' Besides, the transactions were not usurious under the laws of New York, where the notes were payable. Association v. Read, 93 N. Y. 474. Therefore, the principle expressed in Miller v. Tiffany, 1 Wall. 298, 17 L. Ed. 540, applies. It was said in that case: 'The general principle in relation to contracts made in one place to be performed in another is well settled. They are to be governed by the law of the place of performance, and, if the interest allowed by the law of the place of performance is higher than that permitted at the place of contract, the parties may stipulate for the higher interest without incurring the penalties of usury. The converse of this proposition is also well settled. If the rate of interest is higher at the place of the contract than at the place of performance, the parties may lawfully contract in that case also for the higher rate.' In Loan Co. v. Cannon, 96 Tenn. 599, 36 S. W. 386, 33 L. R. A. 112, a note secured by mortgage was given to a building and loan association and made payable at Minneapolis. It provided for the payment of 5 per cent. interest per annum and 5 per cent. premium per annum, monthly, on or before the last Saturday of each month, and stipulated, further, that 'any failure to pay interest or premium when due shall, at the election of the payee, make the principal, interest, and premium at once due.' Of the note and mortgage the court said: 'The second assignment of error is that the note and mortgage were both usurious on their faces, and nonenforceable. As already stated, the note stipulated on its face to pay 5 per cent. interest per annum, and 5 per cent. premium per annum, at the office of the company at Minneapolis, Minn. This contract is a Minnesota contract, and is expressly authorized by the charter of the company and the laws of that state, which have been distinctly proved and appear on the record.' The assignment of error was held not well taken."

It only remains to determine what method of settlement would be just and equitable to all concerned. All of the authorities agree that, upon the insolvency and premature winding up of a building and loan association, some method of settlement which would be fair and equitable to all concerned should be adopted. Endlich discusses the question of "Dissolution and Effects of Dissolution" at length in his second edition at pages 505 and 525, and shows that equality of burdens and benefits are the things to be aimed at in such cases, so that all losses may not fall upon any one class of stockholders. See Thompson, on the same subject, under the head of "Dissolution and Settlement." In the very nature of things, courts in trying to apply equitable principles to settlements in such cases have reached different conclusions, but the most equitable and just mode, in my judgment, is announced by Judge Grosscup in the case of Towle v. Association (C. C.) 60 Fed. 135, delivered February 6, 1894. The rule in this case formed the predicate of the decree ren-

dered by Judge Parlange on the report of the master in the case of Miles v. Association, rendered March 21, 1900, which decree I fully approve as equitable, reasonable, and just to all concerned.   The record shows that the fellow members of the complainants are being required to settle and are settling elsewhere under this decree, and to allow borrowers in Mississippi to enjoy the use of the funds of the association free of cost, and to appropriate all of their payments upon the principal of their debt, while their fellow members elsewhere are required to stand by their contracts and the order of court of primary jurisdiction, would be unjust, and I cannot allow any such contention to prevail in this court.   It seems clear to me that if all the stockholders of the association · shall be made to suffer equally the losses incident to the unfortunate venture of this association, and to share equally whatever benefits are to be derived therefrom, then equal and exact justice will have been meted out to all, and this is my conception of "doing equity" in the premises.

There has grown up in the federal courts within the last few years a sort of comity, by which a receiver, appointed by the court of primary jurisdiction, is recognized by the courts taking ancillary jurisdiction of the case.   Ordinarily the court of primary jurisdiction has every opportunity to judge of the justice and necessities of the situation.   Therefore, where the rules adopted by the court of primary jurisdiction seem fair and lawful, courts of ancillary jurisdiction follow the same, not because they are courts of inferior jurisdiction in reference to the matters connected with the receivership coming under their charge, but because it is the best method of promoting a homogeneous, harmonious, and equitable administration of the estate.   The rule referred to finds expression in the case of Towle v. Association, above referred to, where Judge Grosscup uses the following language:

"Under the federal procedure, the receiver appointed in this court is, by a system of ancillary proceedings, likewise appointed receiver in the several circuits in which this property is situated.   The administration of the assets is thus centralized.   The ancillary is but a part of the home receivership.   There is but one administration,—one distribution.   Each shareholder, whether he lives in Illinois or Massachusetts, will receive his exact proportionate amount, as if he were a citizen of the same state.   For the purposes of the suit there is but one incidental expenditure.   It is obvious that no quicker, cheaper, or more equitable administration could be had."

See, also, McMurray v. Gosney (C. C.) 106 Fed. 11–13:

"Where the affairs of an insolvent building and loan association are to be ·wound up in a federal court in the state of its domicile, the rule adopted by that court for accounting and settlement between the receiver of the corporation and its borrowing stockholders will be followed by a federal court of another district which has appointed an ancillary receiver."

I have been much impressed with the fairness of the able and exhaustive report of the special master, Mr. Kruttschnitt, above referred to, and with his method of settlement with borrowing members of the defendant association, which were adopted by the court of primary jurisdiction, and which I also adopt as the proper method of settlement with borrowing members in Mississippi.   As a copy of the order made by Judge Parlange in the premises is on file in this

cause, and as the amounts paid by complainants have been agreed upon in the evidence, I take it that the parties can agree upon the amount for which a decree may be entered in this case. Let a decree be entered in accordance with this opinion, and, if the parties cannot agree upon the amount to be inserted therein, let the case be referred to the clerk of this court to state an account in accordance with this opinion, and further specific directions to be given, if necessary.