FRANKLIN OPERA HOUSE CO., Limited, v. ARMSTRONG.

GUNBY v. SAME.

(Circuit Court of Appeals, Fifth Circuit. November 21, 1904.)

Nos. 1,242, 1,301.

1. FEDERAL COURTS—ANCILLARY JURISDICTION—SUIT BY RECEIVER.

Where a federal court has obtained jurisdiction over the property and assets of an insolvent building and loan association within its district by the appointment of a receiver in an ancillary suit for winding up the affairs of the association, a bill by the receiver to foreclose a mortgage against a borrowing stockholder on property within the district is ancillary to such suit and within its jurisdiction, without regard to the citizenship of the parties or the amount in controversy.

2. BUILDING AND LOAN ASSOCIATIONS—INSOLVENCY.

Insolvency, as applied to a building and loan association, does not mean inability to pay its outside debts; but it is insolvent, in such sense as to warrant a suit by a stockholder for the appointment of a receiver and to wind up its affairs, when its financial condition is such that it is unable to carry to completion the purpose of its creation.

3. RECEIVERS—VALIDITY OF APPOINTMENT—COLLATERAL ATTACK.

The regularity of the appointment of a receiver by a court which had jurisdiction of the parties and the subject-matter cannot be collaterally attacked.

4. BUILDING AND LOAN ASSOCIATIONS — INSOLVENCY — ENFORCING DEMANDS AGAINST BORROWING STOCKHOLDERS.

Where a building and loan association becomes insolvent, and proceedings are instituted for winding up its affairs, the court as a matter of necessity may require borrowing stockholders to pay forthwith the amounts due from them, although they are not in default and their obligations are not due by their terms.

5. SAME—CONTRACTS WITH BORROWING STOCKHOLDERS—USURY.

The charter of a building and loan association, organized under the laws of Louisiana and in conformity to Sess. Acts 1888, p. 177, No. 115, relating to such associations, provided for the issuance of different kinds of stock. Defendant subscribed for series stock, class B, and also became a borrower of a sum equal to the face value of the stock. Under the charter such stock was matured by the payment of 142 monthly installments. It did not share in the general earnings of the association, and the holder was not entitled to vote. The subscription and borrowing contracts, although executed contemporaneously, were separate and distinct. By the former defendant contracted to pay the 142 installments to mature his stock, and by the latter he executed his note for the amount borrowed, due in 142 months and bearing interest at 6 per cent., payable monthly; such rate being lawful under the laws of the state. The note was secured by a mortgage of property and a pledge of the stock, which, when matured, was to be applied in cancellation of the loan. *Held* that, the note being lawful on its face, the transaction was not rendered usurious because of the stock contract, in the absence of proof of a corrupt agreement, or that it was a device or shift to cover usury, within the contemplation of both parties; it appearing that the agreements were entered into by defendant freely and voluntarily, and with full knowledge of their terms and conditions.

6. SAME—ESTOPPEL.

One who becomes a subscriber to the stock of a building and loan association, and a borrower therefrom, and makes the payments required

---

¶ 1. Supplementary and ancillary proceedings and relief in federal courts, see note to Toledo, St. L. & K. C. R. Co. v. Continental Trust Co., 36 C. C. A. 195.

¶ 3. See Receivers, vol. 42, Cent. Dig. § 103.

by his contracts in accordance with its by-laws, thereby recognizes it as a bona ·fide building association, with power to issue stock, and cannot thereafter question the validity of his stock, and set up the claim that the installments paid thereon were payments on his loan, contrary to the provisions of his contract.

7. USURY—LIMITATION OF RIGHT TO RECOVER USURY PAID—LOUISIANA STATUTE.

Under the statute of Louisiana, which authorizes the recovery back of usurious interest paid if a suit or proceeding therefor is instituted within 12 months after the payment is made, the limitation is a condition of the right itself, and not merely a part of the law of the remedy, and, unless the right is asserted within the time fixed, it ceases to exist, and cannot be claimed or enforced in any form.

8. BUILDING AND LOAN ASSOCIATIONS—INSOLVENCY—SETTLEMENT WITH BORROWING STOCKHOLDER.

In the settlement between the receiver of an insolvent building and loan association and a borrowing stockholder, the equitable rule is to charge the borrower with the amount of the loan, with the interest stipulated in the contract, and credit him with interest paid and with the present value of the stock as determined by the ascertained or estimated dividend to which he will be entitled thereon in the distribution of the assets; but, where he kept up all his payments to the time of the insolvency and receivership, he cannot be charged with an attorney's fee stipulated for in the contract in case of his default.

9. SAME—RIGHTS OF PURCHASER OF MORTGAGED PROPERTY.

Where a purchaser of real estate expressly assumed in the conveyance payment of the balance due from the vendor to a building and loan association secured by a mortgage of the property, which secured, not only a note given by the vendor for a loan from the association, but also the payment of installments on stock subscribed for by the vendor and pledged to secure the loan, such purchaser cannot set up as against the association that the stock was invalid and the transaction usurious, when it was valid between the parties, and especially where the vendor is before the court insisting on the validity or fairness of the contract; nor has the purchaser any standing to insist that stock payments made by it after the purchase shall be applied on the loan, and not on the stock, on the ground that it did not become owner of the stock, since the obligation it assumed extended to such stock payments, and their application is therefore immaterial, as between it and the association.

10. SAME—RIGHTS OF PURCHASER AGAINST VENDOR—SUBROGATION.

In a suit by the receiver of an insolvent building and loan association against a borrowing stockholder and a subsequent purchaser of the mortgaged property to foreclose the mortgage and the lien on the stock pledged, it appeared that the stockholder sold the property for a stated price, a part of which was paid in cash and a part by the purchaser's assumption of the balance due on the mortgage as computed by the parties. In fact the · amount due exceeded such computation, and the purchaser also paid installments on the vendor's stock, of which the purchaser did not become the owner, and which payments, while secured by the mortgage, were not applied upon the mortgage debt assumed. *Held,* that the court in such suit could only give the purchaser relief in respect to such overpayments to the extent of subrogating the purchaser, on its payment of the amount found due the association, to the lien of the association as pledgee of the stock owned by the vendor.

McCormick, Circuit Judge, dissenting.

Appeals from the Circuit Courts of the United States for the Western and Eastern Districts of Louisiana.· ··· ·-- --

Gunby v. Armstrong is an appeal from the Western ·District of Louisiana, and Franklin Opera House Company v. Armstrong comes up from the Eastern District of that state. The principal issues are alike·in both cases, and hence

they were submitted at the same time. In both suits, Armstrong, as receiver of the New South Building & Loan Association, is a party, and the litigation results from a failure to agree upon terms of settlement after the association passed into the hands of the receiver. A scheme or plan of settlement, as between the insolvent association and its borrowing stockholders, was formulated by Mr. E. B. Kruttschnitt in an elaborate report submitted by him as special master to the court of primary jurisdiction, sitting in the Eastern District of Louisiana, and by an order duly passed by Judge Parlange the plan recommended was adopted. The report of the master and the order of the court will be found textually reported in Miles v. Association (C. C.) 111 Fed. 946–972, to which reference is made in connection with this statement of the case. It is admitted by counsel that since the submission of the master's report a large number of the outstanding loans have been collected, pursuant to the order of the court, thus considerably reducing the amount of the indebtedness against borrowing members. The association continued its operations as a going concern in Louisiana, Mississippi, Georgia, and several other states until June 2, 1899, when, owing, it is alleged, to adverse decisions, mainly by the Supreme Court of Mississippi, on the question of usury, Mrs. Feliciana R. Miles, one of its stockholders, filed a bill in the United States Circuit Court for the Eastern District of Louisiana praying the appointment of a receiver. On the following day an order was made by Judge Pardee, and concurred in by Judge Parlange June 5th, appointing the appellee, Armstrong, receiver of the association, pursuant to the prayer of the bill. On October 25, 1899, the receiver presented to the court a petition requesting instructions as to how he should deal with borrowing members of the association, and on October 31st, following, an order was made by Judge Parlange referring the petition to Mr. Kruttschnitt as special master, with directions to ascertain and report "what would be a proper basis for the adjustment, settlement, and collection, at this stage of the cause, of the obligations of the borrowing members of the defendant, the New South Building & Loan Association." On February 16, 1900, the master submitted his report, which was, as above stated, approved and confirmed by the court. As to the parties represented at the hearings before the master, it is said in the report: "The application of the receiver is necessarily one made ex parte. The action which the receiver seeks to take is approved of by the complainant, and apparently acquiesced in by the defendant, as it did not appear before the master, although duly notified. Neither the American Trust & Banking Company, which has filed a bill in the United States Circuit Court for the Northern District of Georgia, seeking to control the administration of almost all of the assets belonging to the series stock fund and in the hands of the receiver, nor any other creditor of the defendant association, is a party to these proceedings. Only one stockholder, and that one a borrowing stockholder, voluntarily appeared before me. I state these facts very fully, in order to show the extreme care which should be exercised by the court in the premises, and the great caution to be observed in dealing with a large amount of assets in the hands of the receiver, in which so many persons are interested, none of whom, with the one or two exceptions above named, have been heard." The foregoing statement applies generally to the two appeals. Reference will now be made to such parts of the record as are deemed applicable to each appeal, separately considered.

### (1) A. A. Gunby v. Johnston Armstrong, Receiver.

The appellant, Gunby, was a borrowing stockholder, having subscribed for 25 shares of series stock, class B, and executed his note, December 26, 1894, to the association for $2,500, payable November 1, 1906, at its office in New Orleans, La., with interest at the rate of 6 per cent. per annum, payable monthly, from date, until paid. To obtain the loan it was necessary to become a stockholder in the association, a preliminary application being required by the rules before the certificate of stock issued. The appellant duly made his application for stock, and a certificate therefor issued. He also applied for a loan of $2,500, to secure which an act of sale was executed as hereinafter mentioned, and his stock deposited as additional security. The following

statement touching the application for stock and loan, the certificate of stock, and the act of sale, is taken from the brief of appellee's counsel:

"The application starts out by declaring that applicant, by occupation a lawyer, hereby subscribes for twenty-five shares of series stock, class B, and applies for membership in the New South Building & Loan Association of New Orleans, La., and understands and especially agrees to the rules of the association governing said class B series stock, and particularly as to the withdrawal value of the shares and as to the relinquishment of all participation of the shares applied for in the profits or dividends or earnings of the association (except as to so much of the profits as may be necessary to mature the stock after 142 payments). The applicant further declares that this relinquishment is in consideration, among other things, of the right to apply for a loan on terms stated in the application, and of the right to receive the amount of such loan without discount, and to pay on the same interest at the rate of 6 per cent. per annum, payable monthly, and of the right to pay no premium on the loan whatever, unless the applicant wishes to repay the loan before the expiration of 142 months, and that in case of such voluntary repayment applicant agrees to pay a premium on the full amount of the loan at certain rates stated in the application. For instance, if he desired to repay the loan and withdraw the stock in the fifth year of his loan, he agreed to pay a premium of 8 per cent., or $200. The applicant further specially agreed that all payments should be made to the home office and that agents had no authority to promise loans or to make any other contract binding the association. The certificate of stock is headed, 'Class B, Series No. 55, 25 Shares.' It certifies that A. A. Gunby, of Monroe, state of Louisiana, is a stockholder in the New South Building & Loan Association of New Orleans, La., and is the owner and holder of twenty-five shares of series stock, class B, therein, of $100 each; that the certificate is issued and accepted by the stockholder subject to all the conditions and limitations contained in the charter and by-laws of the association; and that such conditions and limitations form a part of the certificate. The certificate states the obligation of the stockholder to be to pay 70 cents per month on the first of each month for each share held for a period of 142 months or until the certificate is canceled or withdrawn under the rules of the association; that all moneys due shall be payable at the home office in New Orleans, provided, however, that payment may be made to a local treasurer for transmission to the home office, but in such case the local treasurer shall be deemed the agent of the local stockholder, and not of the association; that 60 cents of each monthly payment, all interest, premiums, fines, and forfeitures, shall go into the series stock loan fund; that when the stock is matured it shall be received by the association in liquidation of the indebtedness of the owner in accordance with his agreement with the association; that the contract between the association and its members is contained in its charter and by-laws, and cannot be changed or altered by any agent or officer of the association; that agents have no power beyond that specially given them in their certificate of authority. The certificate contains an indorsement, signed by appellant, that, in conformity with the rules and regulations of the association, he has transferred the certificate, with all rights thereunder, to the association, in order to further secure the association the advance made him on the shares of stock evidenced by the certificate. The date of the application for stock is November 24, 1894, the date of the certificate is December 24, 1894, and of the indorsement December 26, 1894. Appellant's application for a loan begins with the declaration that Mr. Gunby, the undersigned, hereby applies to the New South Building & Loan Association of New Orleans for a loan of $2,500 on 25 shares of the association on the terms and conditions, under the rules and regulations of the association, and in accordance therewith. The following paragraph occurs in the application: 'It is thoroughly understood and agreed by me, in making this application: First, that this loan, if made, will be made by the New South Building & Loan Association of New Orleans, Louisiana, and accepted by me, on the terms and conditions and subject to all the regulations contained in the charter and by-laws of said association, and subject to all the rules of the association, and on the terms and conditions to be further stipulated by said association; and I agree to comply with the

same and to accept the loan at the date the same is allowed by the board of directors of the said association.' This application is signed and sworn to by appellant, who states in his affidavit that he fully understands that the loan, if allowed, will be made in reliance on the truth of the statements therein given. According to the usual mode of procedure in building and loan association transactions, the real estate to secure the loan was transferred to the association, and from association back to appellant, in order to secure the loan by a vendor's lien and special mortgage. Among the stipulations contained in the act of sale to appellant are the following: Appellant declared that, as a part of the consideration of the sale, he binds himself to pay monthly, at the office of the corporation, until he takes up and pays his · note for $2,500, the monthly dues or installments on 25 shares of stock taken by him under the above referred to certificate, which amount to 70 cents per share, or $17.50 per month, and that, in order still further to secure the loan, he does give in pledge to the corporation all installments now paid and to be paid on said 25 shares of the capital stock of the association, and that the certificate therefor he had delivered to the representatives of the association, and that the said pledge was made under all the terms and provisions of the charter and by-laws of the corporation. The act of sale contained, among others, the following clause: 'Said vendor hereby reserves to itself (and the purchaser consents thereto) the right to apply whatever payments are made, either to the interest, dues, fines, taxes, or insurance, as said vendor may elect.' It was further expressly agreed and understood in the act that if the purchaser should pay the interest on his note monthly, and should pay the installments due upon his stock promptly and punctually, then the principal of the note should not become exigible until the value of · the 25 shares of stock, with dividends or accumulations thereon, should become equal to the amount of the obligation, with all interest and costs due upon the same, at the happening of which event the stock and the indebtedness should cancel each other; the stock and the indebtedness being alike extinguished. It was also agreed and understood that, in case the purchaser should for the term of two months fail or neglect to pay the installments of interest or dues, or any portion thereof, or any and all. costs and fines that might be due by him to the association, such failure or neglect should at once, without demand, without putting in default, and as a penalty, make the promissory note, with all back interest thereon, become immediately due and exigible, and should entitle the association to enforce, by executory process or by ordinary proceedings at law, the collec-· tion of the note and all interest due thereon, together with all sums due the association for insurance premiums, taxes, installments on said shares of stock, and attorney's fees, etc. It appears from the record that the monthly installments of $17.50 on account of the stock and $12.50 on account of interest were paid by appellant up to and including the installments and interest due for the month of May, 1899. In February, 1899, appellant applied to repay his loan and withdrew his stock. A statement was sent to him, from which it appeared that at that time, considering the book value. of the assets of the association, the withdrawal value of his stock was $765.: He was charged 8 per cent. premium, amounting to $200, for repayment in. the fifth year. He denied the right of the association to charge this premium, and brought suit in the Fifth district court for the parish of Ouachita to. compel the association to settle with him without demanding the premium.; The suit was dismissed on exception to the jurisdiction."

A few days after Mrs. Miles filed her original bill in the Eastern Dis-' trict of Louisiana seeking the appointment of a receiver, as set forth in the general statement of this case, she filed an ancillary bill in the United States Circuit Court for the Western District of that state. The ancillary bill having been submitted to Judge Pardee, he made an order, June 6, 1899, adjudging and decreeing that the court take ancillary jurisdiction of the cause with the United States Circuit Court for the Eastern District of Louisiana, recognizing and confirming Armstrong as receiver, "to the end that all the affairs, concerns, and business of said association may be liquidated, adjusted, and wound up under the supervision of the United States Circuit· Court for the Eastern District of Louisiana." Upon application duly made to

the Circuit Court for the Western District of Louisiana, Judge Boarman made an order, December 24, 1900, decreeing that "the report of E. B. Kruttschnitt, special master, and the decree of the United States Circuit Court for the Eastern District of Louisiana affirming said report, be and the same are hereby ratified, adopted, and confirmed."

The appellant and the receiver having failed to agree upon a settlement of the former's indebtedness, the receiver filed in the Circuit Court for the Western District of Louisiana, July 9, 1901, a petition or bill against the appellant, in the ancillary proceeding instituted by Mrs. Miles, in which he sought to recover the indebtedness due by appellant to the association and the foreclosure of the lien upon the real estate given to secure it. The answer of the appellant denies that the association is insolvent and claims that the attempt to compel him to pay his indebtedness before maturity, by forcing the association into liquidation without just cause, is unjust and inequitable. It is further averred that as the owner of series stock, class B, he did not participate in the earnings of the association, and that it agreed to make the loan to him, without discount and without any premium whatever, at the rate of 6 per cent. per annum; that his contract stipulated that the shares subscribed for by him should be fully paid up in 142 months; and that the repayment of the loan could not be demanded by the association as long as the monthly installments were promptly paid. It is further averred as follows: "Defendant avers that this loan was made through a regularly established branch of the New South Building & Loan Association, which was in active operation in the city of Monroe; that said branch organization had its own board of directors, and fully conducted and carried on its own business, and advertised that it would loan money on good mortgage security at 6 per cent. per annum interest. Avers that the whole intention, purpose, and consideration of said contract was to make a straight loan of money, and that the subscription for nonparticipating shares of stock did not make, nor was it intended to make, defendant a mutual member of said association; that it was not of the nature of a building and loan association, but was a simple contract of loan, which made defendant a debtor of said association for the amount of money borrowed, and entitled him to credit for all amounts paid by him on said loan." The answer further avers that from December, 1894, to June, 1899, inclusive, the appellant paid $30 a month to the association, aggregating $1,650, which he claims should be credited on the loan at the date each payment was made, leaving a balance of $1,280 due July 1, 1899; that the appellant has been ready and willing at all times, and is still willing, to carry out his contract, but he denies the right of the association beyond the terms thereof. The answer concludes with the following prayer: "Wherefore defendant prays that complainant, the receiver of the New South Building & Loan Association, be ordered and compelled to file an accounting especially of the stock in series B of said association, and that the demands of complainant against defendant be rejected, and that defendant be permitted to carry out his contract with the New South Building & Loan Association, according to the terms and the true intent thereof; and further humbly prays to be hence dismissed, with his reasonable costs and charges in this behalf most wrongfully sustained."

Reference having been made to the master, Mr. Thomas T. Taylor, to state the accounts between the parties, and his report having been confirmed by the court, a decree was passed in favor of the receiver for $3,158, with foreclosure of the lien as prayed for. The sum adjudged against the appellant, $3,158, is composed of the following items, as taken from the decree: (a) The principal of the promissory note given by said defendant, $2,500. (b) Interest on said note at 6 per cent. per annum from June 1, 1899, to November 30, 1902, $525. (c) Attorney's fees, 10 per cent. on amount in suit, $302.50. The defendant under the decree of the United States Circuit Court is entitled to a credit of 20 per cent. on the value of certificate No. B27 (which was, per tableau, $847.50), $169.50. Leaving the amount due the receiver of $3,158.

From the decree thus rendered the defendant, Gunby, has appealed to this court.

## (2) Franklin Opera House Company, Limited, v. Johnston Armstrong, Receiver.

From the record it appears that this suit was originally instituted by appellant as an independent action, August 17, 1900, against Mrs. Lucy De Long and her husband, and Johnston Armstrong as receiver of the New South Building & Loan Association, and was ordered by the court to stand as an intervention in the receivership proceedings. On April 10, 1895, Mrs. De Long applied to the association for 50 shares of stock, class B, and, after compliance by her with the usual preliminaries, the certificate issued, and on the same day the stock was pledged as collateral security for the loan hereinafter mentioned. Mrs. De Long's application for a loan of $5,000 was granted, and, on May 7, 1895, being thereunto duly authorized by her husband, she executed her note to the building association for the amount named, payable 142 months after date, at the office of the association in New Orleans, La., with interest at the rate of 6 per cent. per annum from date until paid. The real estate upon which the lien is sought to be foreclosed by the appellee was by the usual sale and resale subjected to the vendor's privilege and special mortgage to secure payment of the note and the performance of Mrs. De Long's contract with the association. After Mrs. De Long had paid, less a few days, 18 monthly installments of interest on the loan at $25 per month, amounting to $448.35, and a like number of monthly installments on the stock at 70 cents per share per month, amounting to $630, she conveyed the property involved herein, November 2, 1896, to the appellant, for the sum of $10,000, of which $5,630 was paid in cash, and touching the balance the act of sale contains the following clause: "The said purchasing corporation, or its agent, does hereby assume the payment of the balance due by said vendor on the mortgage note dated May 7, 1895, secured by the vendor's lien and special mortgage in favor of the New South Building & Loan Association of New Orleans, Louisiana, bearing upon and affecting the property herein conveyed, which said balance is now computed at four thousand three hundred and seventy dollars ($4,370.00), and the payment whereof is assumed upon the terms contained in the act of sale from said building and loan association to the said Mrs. De Long, of record," etc. By the act of sale Mrs. De Long did not specifically convey her 50 shares of stock in the association to the appellant; and it may be said that the appellant has neither claimed to be the owner of the stock nor has it been recognized as such by the association. Subsequent to the sale of the property by Mrs. De Long to the appellant, the latter paid to the building association and receiver $1,995, which was imputed as follows: To the payment of interest on the loan, $875; to monthly installments on stock, $1,085; and to fines, $35. After the appointment of the receiver $280, included in the above amount of $1,995, was remitted to him in payment of dues, etc., which brought the account of appellant down to October, 1899; and it thus clearly appears that all stock installments were paid to the date of the receivership and all interest to the date last mentioned, to wit, October, 1899. It is to be noted that the appellant was not a party to the contract between the association and Mrs. De Long, nor was the association a party to the act of sale between Mrs. De Long and the appellant. Indeed, it appears that the association was not informed of the sale by Mrs. De Long to the appellant until long after it had been consummated. A lengthy correspondence took place between the receiver and a representative of the appellant in reference to an adjustment of the indebtedness resting upon the property, but without result, and as a consequence the suit was instituted by the appellant as above stated.

Briefly stated, in the petition of intervention the appellant claimed that the association was in no proper sense a building association, and that Mrs. De Long was not a stockholder, the stock being merely a fiction; that the transaction between the parties was purely a commercial loan, usurious in its nature; and that all monthly payments made by Mrs. De Long and the appellant should be credited upon the principal and interest of the loan. It is further alleged that 53 partial payments of $60 each had been paid on the original indebtedness, aggregating $3,180, and that as a penalty for the

usurious and extortionate interest the entire amount should be credited, thus leaving a balance due by the appellant of $1,820. The petition concluded with the following prayer: "(1) That there be judgment against the said receiver and against the said Lucy Ashton Evans De Long decreeing petitioner to be entitled to full credit of three thousand one hundred and eighty dollars ($3,180.00) upon the said note of five thousand dollars ($5,000.00), and in the alternative petitioner prays: (2) That, if the court declares said alleged stock genuine and bona fide and the interest charged not usurious, then that petitioner have credit on said note for all the partial payments of principal, or for the value of said alleged certificate B92, amounting to the full sum of eighteen hundred and fifty-five dollars ($1,855.00), and petitioner further prays for all general and equitable relief, and for all orders and proceedings necessary in the premises." An answer and cross-complaint were filed by the appellee, the receiver, in which he sought to recover the entire amount of $5,000, with 6 per cent. interest from October 1, 1899, attorney's fees, and costs of suit. Mrs. De Long made no answer to the cross-complaint filed by the appellee, and a decree pro confesso was taken against her. In her answer to the petition of the appellant she admitted the facts touching the sale of the property to the appellant, but claimed that she was the owner of the 50 shares of stock, and as such was entitled to whatever dividends there might be declared upon the same, and her prayer was consistent with the claim set up. The intervention was referred to Mr. Kruttschnitt, as master, who found in favor of the appellee against the appellant and Mrs. De Long in the sum of $5,000, with 6 per cent. interest from October 1, 1899, and 10 per cent. attorney's fees, less a credit of $312, which latter amount was allowed as an anticipatory dividend on the book value of Mrs. De Long's stock.

In reference to the state of account between Mrs. De Long and the appellant, and the adjustment of the state of the rights and equities between them, the master reported as follows: "It is to be borne in mind, however, that whilst the association has, in my opinion, the undoubted right to recover the full sum of $5,000 and interest and attorney's fees as above stated, still the payment of that amount is secured, not only by mortgage on the opera house company's property, but also by pledge of Mrs. De Long's stock; and it is further to be borne in mind that she sold the property purchased by the opera house company for a price of ten thousand dollars ($10,000.00), whereof she received in cash $5,630, and through some erroneous computation between herself and the company computed the balance due upon her mortgage note at only $4,370, instead of $5,000. It is further to be borne in mind that the Franklin Opera House Company has paid the sum of $1,085 in installments on stock, which installments were secured by mortgage on the property sold by Mrs. De Long to the company, and as to which the company did not assume her obligations. It would therefore seem quite clear that under her warranty Mrs. De Long would be bound to the opera house company to the extent of $630 excess in the amount due on the mortgage note over the amount at which that indebtedness was computed in her act of sale to the opera house company, and for the further sum of $1,085 amount of installments paid by the Franklin Opera House Company on account of her indebtedness on her stock. Apply these principles to the case at bar, and we find that the opera house company has certainly paid installments due upon the stock of Mrs. De Long to the amount of $1,085, and that, whenever the decree to be rendered in this cause in favor of the receiver shall have been satisfied, it will also have paid an amount of $630 in excess of the amount which by its act of purchase it assumed on account of Mrs. De Long's loan from the association. By these payments, which it had an interest in making, and which were necessary in order to save its property from seizure and sale, it became subrogated to all the rights of the association as against Mrs. De Long. As subrogee, it can, of course, not compete with the subrogor, who is entitled to be first paid. Civ. Code, art. 2162. Hence it follows that the association and its receiver may enforce payment of the whole amount due to them by Mrs. De Long by seizure and sale of the property mortgaged, and also by en-

forcing the pledge of the stock, which was given as further security for the rights of the association; and it follows that after the association, or its receiver, shall have been paid, the opera house company will be entitled as subrogee to recover the amounts which it was not personally obligated to disburse, and which it has or may hereafter disburse for account of Mrs. De Long, and the reimbursement of these amounts is secured by pledge of her stock. This is the necessary result from the application of the laws of the state of Louisiana to this case, and it also leads to most equitable conclusions. Third. I further find that from an account and dividend list filed by the receiver it appears that Mrs. De Long is entitled to a dividend of 20 per cent. on the book value of her certificate of stock; that is to say, 20 per cent. of $1,560, or $312. As this amount constitutes cash in the hands of the receiver, collected from the stock pledged to him, it should be imputed as a credit on the amount which I have above found as the amount due to the association, and I shall so impute it in the decree which I shall hereinafter draft and recommend to the court for adoption. It is to be further noted that, inasmuch as the receiver would be entitled to collect the fines of $35 due by Mrs. De Long out of this sum of $312, if he had not already collected it from the Franklin Opera House Company, by crediting this full sum of $312 upon the amount now found to be due to the association, the opera house company indirectly obtained a credit for the $35 of fines which I have above stated should not be debited to it. If, in other words, the receiver should hand back to the opera house company the $35 of fines erroneously debited to that company, he would reimburse himself for such payment out of this sum of $312, reducing the credit from $312 to $277. The same result, with less circumlocution, is brought about by crediting the whole sum of $312 to the net indebtedness of Mrs. De Long as above set forth."

The master included in his report a form of decree in accordance with his findings, and the report was approved and confirmed by the court. The decree provided for the sale of the property to satisfy the indebtedness due the receiver as above set forth; and on the question of subrogation, as affecting the issue between the appellant and Mrs. De Long, it provided as follows: "It is further ordered, adjudged, and decreed that after the claims of said New South Building & Loan Association, for which a decree is herein rendered in favor of said receiver, shall have been paid in full, the Franklin Opera House Company, Limited, be, and it is hereby, subrogated to the claims of said New South Building & Loan Association, and of said receiver, as pledgees of 50 shares of stock of the New South Building & Loan Association represented by certificate No. B92, for fifty shares of the stock of said association, and that as such subrogee said Franklin Opera House Company, Limited, be, and it is hereby, decreed to be entitled to recover from said Mrs. Lucy Ashton Evans, wife of H. L. De Long, the sum of one thousand seven hundred and fifteen dollars ($1,715), with interest thereon at the rate of five per cent. per annum upon the amounts and from the dates following, to wit: On six hundred and thirty dollars ($630) from the date when the decree in favor of said receiver shall have been paid in full; on thirty-five dollars ($35) from January 4, 1897, until paid; on a like amount from each of the dates following until paid, to wit: January 30, 1897; March 6, 1897; April 3, 1897; April 30, 1897; June 1, 1897; July 1, 1897; August 2, 1897; September 2, 1897; October 2, 1897; October 20, 1897; December 1, 1897; January 3, 1898; February 11, 1898; March 3, 1898; June 8, 1898; and on four hundred and twenty dollars ($420) from December 28, 1898, until paid; and on one hundred and five dollars ($105) from October 14, 1899, until paid; and said sum so decreed being subject to a credit of two hundred and seventy-seven dollars ($277) as of date February 22, 1902, and to be imputed according to law as a payment of said date. It is further ordered and adjudged that the said fifty shares of stock represented by certificate B92 be, in the event of such subrogation, sold without appraisement for cash by ———, Esq., who is hereby appointed special master for the purpose, and that out of the proceeds of said sale said special master do pay the expenses of said sale, and then unto the said Franklin Opera House Company, Limited, the sum hereinabove found to be due, and secured by pledge as afore-

said, and deposit any balance in the registry of the court to the credit of this cause."

From the decree thus rendered the opera house company only has appealed.

E. T. Lamkin and A. A. Gunby, for appellant Gunby.

Philip H. Mentz and R. L. Tullis, for appellant Franklin Opera House Co.

George Denegre and Joseph Paxton Blair, for appellees.

Before McCORMICK, Circuit Judge, and MAXEY and JONES, District Judges.

MAXEY, District Judge, after stating the case, delivered the opinion of the court.

The records before us embrace two distinct appeals, and each one will be considered in its order.

## (1) Gunby v. Armstrong, Receiver.

The appellant objects to the jurisdiction of the Circuit Court upon the ground that both he and the appellee, Armstrong, receiver, are citizens of the state of Louisiana. His objection was not much insisted upon in the oral argument, and slight consideration is given it in the briefs. Regarding the facts, it may be stated that the Circuit Court for the Eastern District of Louisiana is the court of primary jurisdiction. Soon after Mrs. Miles, who was a citizen of the state of Texas, filed her bill in the Circuit Court for the Eastern District which culminated in the appointment of the appellee as receiver of the New South Building & Loan Association, a corporation organized under the laws of the state of Louisiana, she filed an ancillary bill in the Western District of that state, and Judge Pardee made an order that the court of the Western District take ancillary jurisdiction of the cause with the Circuit Court for the Eastern District, and recognized and confirmed Armstrong as receiver—

"To the end that all the affairs, concerns, and business of said association may be liquidated, adjusted, and wound up under the supervision of the United States Circuit Court for the Eastern District of Louisiana."

By filing the bill in the Circuit Court for the Western District of Louisiana, supplemented by the order passed by Judge Pardee, the court of the Western District acquired jurisdiction of the cause, and any suits thereafter instituted by the receiver for the collection of the assets of the association were clearly within its cognizance, regardless of the citizenship of the parties or of the amount in controversy. White v. Ewing, 159 U. S. 36, 15 Sup. Ct. 1018, 40 L. Ed. 67; Rouse v. Letcher, 156 U. S. 47, 49, 15 Sup. Ct. 266, 39 L. Ed. 341; Pope v. Louisville New Albany etc. Railway, 173 U. S. 573, 19 Sup. Ct. 500, 43 L. Ed. 814.

The appellant further insists that the building association was solvent at the time of the appointment of the receiver, and hence it is claimed that the order of appointment was unauthorized. If the term "insolvency," as applied to a building association, be construed to mean mere inability to pay its creditors, then the association was not insolvent at the time the court took charge of its

affairs by the appointment of a receiver. But such is not the true meaning of the term in its application to corporations of that character. The insolvency of a building association, employing the words of another, is a peculiar thing. "It is the inability of the building association, not to pay its outside debts (for that does not seem to have ever occurred, and, in the nature of things, can scarcely be thought of), but to satisfy the demands of its own members, that has been recognized as an insolvency." End. Bldg. Ass'ns (2d Ed.) 511; Towle v. American Bldg., etc., Society (C. C.) 61 Fed. 446. And when in the course of its business it reaches the point where it finds itself unable to carry to completion the purposes of its creation—in a word, when the consummation of the scheme becomes impracticable—it may be said to be unable to satisfy the demands of its own members. "Hence," it is said by Mr. Endlich, "the insolvency of a building association, leaving no prospect of a consummation of its initial design, is recognized, if not as a dissolution of it, at all events as a sufficient ground for the abandonment of the enterprise and for proceeding to wind up the corporation. In such case the method to pursue is by way of petition by members to the court for the appointment of a receiver." 2 End. Bldg. Ass'ns, § 511. "Yet, because of the peculiar character of that which alone constitutes insolvency in a building association, it is not every person having a demand upon it who can have a standing to move the court to action. Such standing is accorded only to claimants in the character and capacity of stockholders." Id. § 512.

In the present case the bill was filed by Mrs. Miles, as a stockholder, and by its allegations a case was presented showing clearly the necessity of prompt action. Diversity of citizenship gave the court jurisdiction of the parties, and the subject-matter was plainly within its cognizance as a court of equity; and, being invested with full jurisdiction, had error supervened, it could not be availed of in this collateral proceeding. The rule has been clearly stated in the following language:

"The appointment of a receiver, by a court possessing general jurisdiction in law and equity, cannot be assailed collaterally, in any action or proceeding, merely because such appointment was inequitable or erroneous; and so long as the jurisdiction, the inherent power—not the exercise of that power, but the power of the court itself to make it—is not questioned, the appointment is conclusive upon all parties until it is adjudged to be vacated in a direct proceeding instituted for that purpose by some party rightfully challenging it; and the presumption is that it was regularly made and that the court had jurisdiction to make it. If the decree was improvidently granted, or if for any reason it should be set aside or modified, relief can be had upon application by any party interested to the court by which it was made; but the regularity of the appointment of the receiver cannot be questioned by any other tribunal." Gluck & Becker, Receivers of Corporations, § 8; High on Receivers (3d Ed.) § 39a, and authorities cited; Edrington v. Pridham, 65 Tex. 612.

We would not, however, be understood as intimating a doubt as to the propriety of the action of the court in making the order complained of. On the contrary, we regard it as one eminently proper to have been made under the circumstances of the case.

It is next and earnestly contended by the appellant that the bill filed by the appellee against him was premature, for the reason that

the note executed by him to the association did not become due and payable until November 1, 1906, or 142 months after its date. Touching this contention it is shown by the record that the appellant subscribed for 25 shares of the stock of the association, and executed his note, December 26, 1894, to the association for $2,500, payable November 1, 1906, at its office in New Orleans, La., with interest at the rate of 6 per cent. per annum, payable monthly. This note was secured by a vendor's lien and privilege reserved, as well as by mortgage and by the deposit of the stock with the association as collateral security. The appellant thus became a member of the association, and it became his duty as a member to pay, under the by-laws of the association, certain monthly installments on his stock, together with interest on his note and other small amounts as a borrowing member, not necessary in this immediate connection to be specified. The theory of the appellant appears to be that his note did not and could not mature until it became due and exigible according to its terms; and especially it is insisted that the obligation as to him could not be considered as matured, since he had promptly paid all installments of interest and other dues required by the by-laws and demanded by his contract with the association. The record discloses that the appellant was not in default, and that he had discharged every duty imposed upon him by his contractual obligations. That the association had failed in the accomplishment of its purpose was not due to any delinquency on his part, but mainly to adverse decisions rendered by the courts of Mississippi on the question of usury. Notwithstanding the stubborn fact remains that the association had ceased to be a going concern. It was practically dead. The scheme had failed, and naught remained to be done but to devise necessary means looking to the winding up of its affairs and to the protection of its members. These objects could be accomplished only by collecting its outstanding indebtedness and marshaling its assets; and the courts have deemed it essential, ex necessitate rei, to depart from the ordinary rule in such cases by requiring borrowing members to pay forthwith the balances due by them, although their contracts may otherwise provide. The principle is aptly stated in the following language:

"In endeavoring to formulate a rule which shall do exact justice to all the parties, in view of the considerations stated, the courts have not arrived at altogether uniform results. On one point there seems to be a general consensus, although the distinct enunciation of the principle is only of very recent date. It is this: that, upon premature dissolution of the association, the advanced members may be compelled to pay forthwith the balances due from them on their securities, although the latter be given in terms for the payment of installments." End. Bldg. Ass'ns (2d Ed.) § 523; Strohen v. Franklin, etc., Loan Ass'n, 115 Pa. 273, 8 Atl. 843; Towle v. American Bldg., etc., Soc. (C. C.) 61 Fed. 446; Curtis v. Granite State, etc., Ass'n (Conn.) 36 Atl. 1023, 61 Am. St. Rep. 17, and note; Leahy v. Nat. Bldg. & Loan Ass'n (Wis.) 76 N. W. 625, 69 Am. St. Rep. 945.

The objection that the suit was premature cannot, therefore, be sustained.

The next assignment of error which we shall consider, and the most important one of the errors assigned, proceeds upon the the-

ory that the contract between the appellant and the association is usurious, in that it really provides for the payment of 12 per cent. interest instead of 6 per cent., as claimed by the latter. By article 2924 of the Louisiana Revised Code of 1870, it is declared:

"Interest is either legal or conventional. Legal interest is fixed at the following rates, to wit: At five per cent. on all sums which are the object of a judicial demand, whence this is called judicial interest. * * * The amount of conventional interest cannot exceed eight per cent. The same must be fixed in writing. Testimonial proof of it is not admitted in any case."

The Code allowing conventional interest at 8 per cent., it is perfectly clear that the note of the appellant, providing for the payment of 6 per cent. interest, was not obnoxious to the charge of usury, unless, indeed, the stock issued by the association to him was a mere fiction, and intended simply as a device under cover of which a greater rate of interest might be exacted than that allowed by law. And such is the contention of the appellant; it being claimed by him that the association possessed none of the features of a building association proper, in which the underlying principle is mutuality, but that it was simply a money-lending concern, and hence that all stock installment dues paid by him should be imputed to the principal of his indebtedness. The association was organized in 1890 by notarial act, pursuant to the laws of Louisiana, including Act No. 115, p. 177, of 1888. This act seems to be the first law enacted by the Legislature of Louisiana providing specifically for the incorporation of building or homestead associations. It provides that the capital stock may be divided into shares and may be payable in installments, as may be provided by the respective charters of such associations. It requires bonds to be given by the secretary and treasurer, and directs that annual meetings of the shareholders shall be held and complete statements made at such meetings by the board of directors. The associations are authorized to purchase and sell real estate either for cash or on credit; and they are invested with power to improve, repair, and build upon real estate, and to make all contracts and do all acts and things necessary and proper in connection therewith. The act further provides that, in case such association shall purchase property from any person and afterwards sell it to the same person, then the association shall have the vendor's lien and privilege upon the property sold to secure the payment of the money by such person. Authority is given to the associations by the act to contract and agree with any person to purchase property and afterwards sell it to the same person, although the agreement be made at one and the same time, and such contracts are not to be considered as a loan, but as a sale to the association, and then a resale by the association to the person from whom it was acquired. Section 5 of the act, and the last save section 6, which provides when the act shall take effect, refers to pledges of stock by shareholders, and is in the following words:

"That it shall be lawful and competent for any shareholder of such associations, when making a contract with such association, to pledge the in-

stallments upon his stock in such association already paid in at the time of making such contract, and those to be paid in after the date of such contract, as security for any debt due by him to said association, and a declaration of such pledge in an authentic act shall create and constitute a full, valid and complete pledge; and the fact of such pledge shall be stamped on the face of the certificate of the stock so pledged." Sess. Acts 1888, No. 115, p. 177.

The charter of the association, following the authority conferred by the act of 1888, fixed the capital stock at $50,000,000, to be divided into 500,000 shares of the par value of $100 each. The shares were divided into two general classes; 1,000 shares to be known as "guaranty stock," and the remaining 499,000 to be known as "series stock." Members of the association holding series stock, were divided into two classes, to wit: Borrowing or advanced members, to whom loans were made; and nonborrowing members, or investors, who did not obtain loans from the association. The stock of each class was further divided into series, numbered 1, 2, 3, and so on; all stock issued in the same month having the same series number. The different classes into which the series stock outstanding at the date of the receivership was divided were known and designated as classes A, B, C, E, G, J, L, M, S, and Z. The principles of classification and the rights and obligations of each class were fixed by the by-laws of the association. All series stockholders, whose shares were not full-paid, were required to pay for their stock in monthly installments of 70 cents, except the stockholders of class C, who paid $1.05, per month. Out of the payments of 70 cents per month 60 cents went to the "series stock fund" and 10 cents to the "guaranty stock and expense fund"; and out of the payment of $1.05 per month 90 cents went to the former and 15 cents to the latter. Borrowing members of class A, series stock, in addition to the monthly installments of 70 cents for each share of stock, paid 6 per cent. per annum interest and 6 per cent. per annum premium on their loans, payable monthly, to wit, 50 cents interest per month and 50 cents premium per month on each $100 borrowed. The scheme contemplated that this stock would mature whenever the amount of the monthly installments paid thereon, together with the amount of the dividends declared on and credited to it, should amount to $100 per share. The loans advanced to members of class B were for the face value of the stock subscribed, evidenced by notes payable 142 months after date. Members of this class paid no premium, except in the event of the payment of the loans before maturity, and the notes executed by them bore interest at the rate of 6 per cent. per annum, payable monthly. Class B stock matured when 142 monthly installments of dues on the same had fallen due and been paid on the certificates, and members of this class did not participate in the earnings beyond the amount necessary to mature the stock. Upon the maturity of the stock the loan and stock canceled each other, both being alike extinguished, and the evidence of indebtedness was surrendered to the member.

Under the scheme devised by the association the guaranty stockholders seem to have had control and management of its affairs.

The holders of this stock elected the board of directors of the association; the series stockholders having no voice therein. The charter made provision for the establishment of branches in Louisiana and other states, to be controlled by local boards of directors, under the management and direction of the association and subject to the by-laws adopted by its board of directors. As to the right of members to vote, it was provided by the by-laws that every member, not in arrears and not indebted to the association, should be entitled to one vote for each share of stock held by him. It is not deemed essential to refer to the distinctive features of other classes of the series stock, nor to go into more minute details as to the characteristics of the stock of class A and class B. The rights and obligations of the holders of the several classes of stock, as well as the characteristics of the stock, are defined by the charter and by-laws, and are set forth at length in the report of the master hereinbefore referred to.

The appellant, desiring to obtain a loan from the association, applied for membership, as loans could be made only to members. He was admitted as a member, and a certificate for 25 shares of series stock, class B, was duly issued to him. His application for a loan of $2,500 was granted, and to secure the same the usual notarial act was executed by the parties, by which the vendor's lien and privilege on certain real estate were reserved and special mortgage thereon given to the association. In addition the appellant also deposited his stock as collateral security. The appellant's application for membership and other steps leading up to the final consummation of the loan may be regarded as contemporaneous acts, although evidenced by separate and distinct instruments. As we have stated above, the appellant paid all interest on the loan and all stock installments and other charges growing out of his contract with the association; and it is disclosed by the record that as monthly interest payments were made they were credited as such, and that the monthly dues on his stock were imputed to the stock, and not to the principal of the indebtedness. Indeed, there is nothing in the record to indicate that the association ever regarded the payment of stock installment dues as anything but payment on the stock. In that respect all stockholders, investors and advanced members, were treated alike. The association dealt with the appellant as both a borrower and a stockholder. The scheme of the association was founded upon the principle of this dual relationship, and the contracts of the appellant recognized and especially provided for it. The act of 1888 not only invested the association with power to divide its stock into shares, to be paid in installments, but also made it lawful and competent for any shareholder, when making a contract with the association, to pledge the installments upon his stock as security for his indebtedness; and the act further provided that a declaration of the pledge in an authentic act should create and constitute a full, valid, and complete pledge. The contracts of the appellant conform to the charter and by-laws of the association and to the legislative act of Louisiana, and should therefore be sustained, unless obnoxious to the objec-

tion that they were intended as mere shifts to deceive and entrap the unwary.

In line with the contention of the appellant that the stock is a mere corrupt device to cover usury, it is said that the stock is without voting power, that it does not share in the earnings or dividends proper, and hence that the transaction is a mere disguise for a straight loan for 142 months upon which moneys, paid on the stock, should be credited as partial payments. This objection is not without force, and the validity of the series stock we are now considering has been doubted by Mr. Justice Whitfield in the case of Crafton v. New South Bldg. & Loan Ass'n (Miss.) 26 South. 362. But for the following reasons we are of the opinion that the contention of the appellant cannot be sustained:

(1) It has been shown that the note executed by the appellant is upon its face free from usury; that he became a borrower of the association's funds, and in a distinct capacity a subscriber of its stock. Under such circumstances it is the duty of the court to so construe the contracts as to make them legal, rather than to set them aside as unlawful. The principle is thus stated by Mr. Justice Brown, speaking for the court, in Investment Co. v. Grymes:

"The court must give to the terms of the contract, if fairly susceptible of it, a construction that will make it legal, but has no right to depart from the terms in which it is expressed to make legal what the parties have made unlawful. Webb on Usury, p. 482; Archibald v. Thomas, 3 Cow. 284." 94 Tex. 613, 63 S. W. 861.

The converse of the latter proposition is equally true. The court has no right to depart from the terms in which the contract is expressed to make illegal what the parties themselves have made lawful. At page 614, 94 Tex., and page 861, 63 S. W., the justice further said:

"If the transaction was such as to render the intention of the parties doubtful, the court would adopt that construction which would attribute to them a legal intention; but we cannot adopt any method for the solution of this question by which we must arrive at a different result from that shown by the contract, because it is impossible to conceive of the parties having an intention to use certain forms of contract that would produce a result different from that which they embodied in the contract actually made."

(2) The note of the appellant being on its face for legal interest only, it was incumbent on the appellant to show, in order to render the transaction usurious, that there was some corrupt agreement, or device, or shift to cover usury, and that it was in the full contemplation of the parties. But no such agreement was shown in this case. The rule is thus stated by the Supreme Court in United States Bank v. Waggener, 34 U. S. 399, 9 L. Ed. 163:

"Where, indeed, the contract upon its very face imports usury, as by an express reservation of more than legal interest, there is no room for presumption, for the intent is apparent. 'Res ipsa loquitur.' But where the contract on its face is for legal interest only, there it must be proved that there was some corrupt agreement, or device, or shift to cover usury, and that it was in the full contemplation of the parties. These distinctions are laid down and recognized as early as the cases of Button v. Downham, Cro. Eliz. 642; Bedingfield v. Ashley, Cro. Eliz. 741; Roberts v. Trenayne, Cro.

Jac. 507. The same doctrine has been acted upon in modern times, as in Murray v. Harding, 2 W. Bl. 859, where Gould, J., said that the ground and foundation of all usurious contracts is the corrupt agreement; in Floyer v. Edwards, Cowp. 112; in Hammet v. Yea, 1 Bos. & P. 144; in Doe v. Gooch, 3 Barn. & A. 664; and in Solarte v. Melville, 7 Barn. & C. 431. The same principle would seem to apply to the prohibition in the charter of the bank. There must be an intent to take illegal interest, or, in the language of the law, a corrupt agreement to take it, in violation of the charter; and so it was stated in the plea in the case of Bank of the United States v. Owens, 2 Pet. 527, 7 L. Ed. 508. The quo animo is, therefore, an essential ingredient in all cases of this sort."

(3) The engagements of the appellant were entered into freely and voluntarily, with full knowledge of all their requirements and limitations. He made contracts with the association, both as a stockholder and a borrower, which upon their face were subject expressly to the charter and by-laws of the association. He dealt with the association at arm's length, and there is in the record an utter absence of evidence tending to show fraud, oppression, or undue advantage taken by the association in reference to the execution of his obligations. In the face of these facts the court is unable to set the contracts aside. Upon this point the Circuit Court of Appeals for the Ninth Circuit used the following language:

"The general rule is, we think, well settled that a court of equity is not authorized to set aside and annul a contract made by parties with full knowledge of all the terms and conditions of the same, without it is clearly and satisfactorily shown that there was fraud, oppression, or undue advantage taken with reference to its execution. Wann v. Coe (C. C.) 31 Fed. 369, 371; Vermont L. & T. Co. v. Dygert (C. C.) 89 Fed. 123, 124; Boyce v. Fisk, 110 Cal. 107, 116, 42 Pac. 473; 1 Story's Eq. Jur. § 331." Pacific States Savings, etc., Co. v. Green, 123 Fed. 46, 59 C. C. A. 167.

See Manship v. New South Bldg. & Loan Ass'n (C. C.) 110 Fed. 845; Hieronymus v. N. Y. & Natl., etc., Ass'n (C. C.) 101 Fed. 12, affirmed by this court 107 Fed. 1005, 46 C. C. A. 684.

The Supreme Court, in Railway v. Voight, 176 U. S. 505, 506, 20 Sup. Ct. 385, 44 L. Ed. 560, quote with approval the following language used by Sir George Jessel, M. R., in Printing, etc., Co. v. Sampson, L. R. 19 Eq. 465:

"It must not be forgotten that you are not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because, if there is one thing which more than another public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred and shall be enforced by courts of justice. Therefore you have this paramount public policy to consider, that you are not lightly to interfere with this freedom of contract."

(4) In view of the contractual relations of the appellant with the association; his recognition of it as a bona fide building association, with power to issue the stock of which he was a subscriber; and his use of its money, coupled with the payment of all interest and stock dues as required by its by-laws and by the terms of his own contract—he is not now in a position to question the validity of the stock. Gibson et al. v. Safety Homestead & Loan Ass'n (Ill.) 48 N. E. 580, 39 L. R. A. 202; Leahy v. National Bldg. & Loan Association (Wis.) 76 N. W. 625, 69 Am. St. Rep. 945. See, also,

Banigan v. Bard, 134 U. S. 291, 10 Sup. Ct. 565, 33 L. Ed. 932; Homestead Company v. Linigan, 46 La. Ann. 1118, 15 South. 369; Manship v. N. S. B. & L. Ass'n, supra; Johnson v. National Bldg., etc., Ass'n (Ala.) 28 South. 2, 82 Am. St. Rep. 257.

(5) The contracts in question were made in Louisiana, and were to be there performed. Under the authorities their construction, upon the subject of usury and the measure of recovery in suits brought to enforce them, should be governed by the jurisprudence of that state. Andruss v. People's Bldg., etc., Ass'n, 94 Fed. 575, 36 C. C. A. 336. In the present case the averments of the appellant's answer disclosed that he paid his last installment of stock dues in June, 1899. His answer setting up usury was filed June 2, 1902, or about 3 years after the payment of the stock dues which he claims tainted the transaction with usury. Assuming, ex gratia argumenti, that the stock installments, added to the rate of interest specified in the note, exceed the conventional rate of 8 per cent., and thus render the transaction usurious, still the claim of the appellant ought not to prevail because of his delay of more than 12 months in interposing the defense. Upon this point, discussing the statutes of Louisiana, the Supreme Court said in Walsh v. Mayer, 111 U. S. 36, 37, 4 Sup. Ct. 262, 28 L. Ed. 338:

"The Circuit Court held that, the whole interest paid being avoided by the Louisiana statute, a court of equity would impute its payment to the principal debt, and rendered a decree accordingly, deducting the whole amount of interest paid from the face of the note. In the view we take, it does not become necessary to decide whether the contract ought to be governed by the law of Louisiana or that of Mississippi; for we are of opinion that the decree in this particular is erroneous according to either. It is not claimed that there is any express provision in the Louisiana statute that requires such an application of payments made on account of unlawful interest. It is rested altogether upon the provision that forfeits the whole interest paid, and authorizes the debtor to recover it back within the time limited. But the same provision is contained in section 5198, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3493], in reference to national banks, under which it has been held that usurious interest actually paid cannot be applied to the discharge of the principal. Driesbach v. National Bank, 104 U. S. 52, 26 L. Ed. 658; Barnet v. National Bank, 98 U. S. 555, 25 L. Ed. 212. In Cook v. Lillo, 103 U. S. 792, 26 L. Ed. 460, the Louisiana statute was considered, and upon the decisions of the Supreme Court of the state it was decided that the usurious interest cannot be reclaimed, nor be imputed to the principal, unless a suit for its recovery is begun or plea of usury is set up to the claim within 12 months after the payment is made. Cox v. McIntyre, 6 La. Ann. 470; Weaver v. Maillot, 15 La. Ann. 395. It is said, however, that the law of Louisiana applies and governs so far as it allows the forfeited interest to be applied in reduction of the principal in an action on the note, but that the limitation of time within which by that law the right must be exercised, being part of the remedy merely, it is governed by the law of Mississippi, being the law of the forum, which contains no such limitation. But the right claimed under the law of Louisiana must be taken as it is given, and is not divisible. The provisions requiring it to be asserted in a particular mode and within a fixed time are conditions and qualifications attached to the right itself, and do not form part of the law of the remedy. If it is not asserted within the permitted period, it ceases to exist, and cannot be claimed or enforced in any form."

And it may be added that according to our understanding of the laws of Louisiana, which have been carefully examined, they are substantially the same now in respect of the question decided in

Walsh v. Mayer as they were when the opinion in that case was rendered.

Attributing, as we do, validity to the stock, and regarding the two contracts of loan and stock subscription as separate and distinct, although contemporaneously executed, we shall proceed to inquire whether the trial court committed error in rendering a decree against the appellant for the sum of $3,158. This amount is composed of the following items: (a) Principal of note, $2,500; (b) interest thereon at 6 per cent. per annum from June 1, 1899, $525; and (c) attorney's fees of 10 per cent. on amount in suit, $302.50— total, $3,327.50, which was credited with $169.50 as anticipatory dividend on the value of the 25 shares of stock held by appellant, leaving a balance due the receiver of $3,158. It will be observed that the question of premium on the loan is not involved in this case, and we expressly refrain from expressing any opinion regarding it. The above statement of account discloses that the appellant was charged as a borrower with the amounts of the loan and interest, together with 10 per cent. attorney's fees, and that as a stockholder he was credited with an anticipatory dividend on his stock. The question arises whether there was error in that method of adjustment.

The method pursued was strictly in consonance with the contracts of the parties and the by-laws of the association, except as to the item of attorney's fees, and it may be added that it was in entire harmony with the maxim that "equity delighteth in equality." When it is recalled that at the date of the receivership there were outstanding in the hands of investors approximately 4,000 shares of class A stock, the injustice of attributing stock installment payments as credits upon the loan becomes easily discernible. The application of such a rule would enable the borrower to escape responsibility for his share of the losses, and shift them entirely to the shoulders of the nonborrowing or investing class. Both classes should stand as nearly as possible upon an equal footing. The association of which the appellant is a member has followed in the footsteps of many others of like character, and it has been compelled to throw up its hands under the stress of judicial assault. The day of reckoning has overtaken it, and its members, as between themselves, should share equally the losses, as well as other resulting disappointments. Excluding from consideration for the moment the item of attorney's fees, it is thought that no rule more equitable can be devised than the one applied in this case. It is sustained by reason and by the decided weight of judicial authority. Thus, in Strohen v. Franklin Saving & Loan Ass'n, 115 Pa. 279, 280, 8 Atl. 843, it is said by the court:

"The insolvency of the company, as before observed, puts an end to its operations as a building association. To a certain extent, it also ends the contract between it and its members, respectively, and nothing remains but to wind it up in such a manner as to do equity to creditors and between the members themselves. As regards the latter, care should be taken to adjust the burdens equally, and not to throw upon either borrowers or nonborrowers more than their respective share. That result may be reached by requiring the borrower to repay what he actually receives, with interest. He would then be entitled, after the debts of the corporation are paid, to a

pro rata dividend with the nonborrower for what he has paid upon his stock. He will thus be obliged to bear his proper share of the losses. To allow him to credit upon his mortgage his payments on his stock would enable him to escape responsibility for his share of the losses and throw them wholly upon the nonborrowers. In other words, the borrower would escape without loss. It will not do to administer the affairs of an insolvent incorporation in this manner."

See Spinney v. Miller (Iowa) 86 N. W. 317, 89 Am. St. Rep. 351; Curtis v. Granite State, etc., Ass'n (Conn.) 36 Atl. 1023, 61 Am. St. Rep. 17; Leahy v. National Bldg., etc., Ass'n (Wis.) 76 N. W. 625; Post v. Mechanics' Bldg., etc., Ass'n (Tenn. Sup.) 37 S. W. 216, 34 L. R. A. 201; Pioneer Savings, etc., Co. v. Cannon (Tenn. Sup.) 36 S. W. 386, 33 L. R. A. 112, 54 Am. St. Rep. 858; Andruss v. People's Bldg., etc., Ass'n, 94 Fed. 575, 36 C. C. A. 336; Douglass v. Kavanaugh, 90 Fed. 373, 33 C. C. A. 107; Hayes v. Southern Home Bldg., etc., Ass'n (Ala.) 26 South. 527, 82 Am. St. Rep. 216; Towle v. American Bldg., etc., Ass'n (C. C.) 61 Fed. 446; Manship v. New South Bldg., etc., Ass'n (C. C.) 110 Fed. 845; Coltrane v. Blake, 113 Fed. 785, 51 C. C. A. 457; Sullivan v. Stucky (C. C.) 86 Fed. 491; Pacific States Savings, etc., Co. v. Green, 123 Fed. 43, 59 C. C. A. 167; Richard v. Southern Bldg., etc., Ass'n, 49 La. Ann. 481, 21 South. 643; 4 Am. & Eng. Enc. Law (2d Ed.) pp. 1081, 1082, and notes; End. Bldg. Ass'ns, §§ 528, 529.

The Supreme Court of Louisiana in the Richard Case, above cited, denying the right of a stockholder to impute stock payments made by him to his loan, used this language:

"The plaintiff made the application for the loan with the distinct statement it was on his shares; that all payments by him, other than interest, were to be imputed to the stock; and the method of payment of loan and stock, and that default of these payments would mature the note, were well defined in the contract. The plaintiff received the $2,000, and has had the benefit of it at 6 per cent., along with the rights conferred on him as a shareholder. With these obligations imposed and the rights secured to him under the contract, he has evinced his own appreciation of the contract, and paid for a period the interest on the loan and the required payments on the stock. We cannot, therefore, without disregarding the contract placed before us and the plaintiff's interpretation of it, manifested by his acts, treat it as a mere loan on usurious interest, as alleged in the answer and contended in argument." 49 La. Ann. 483, 21 South. 643.

This case was cited with apparent approval by the Supreme Court in Building & Loan Association v. Price, 169 U. S. 54, 18 Sup. Ct. 251, 42 L. Ed. 655, where it was said:

"A question somewhat similar to this has been decided in Richard v. Southern Building & Loan Association, 49 La. Ann. 481, 21 South. 643, where it was held that a loan of this nature was not to be treated as usurious, for the reason that the payments supposed to constitute the usury were by the terms of the contract made upon the stock debt, and not upon the loan."

In Texas, where the adjudications of the courts have been unfavorable to building associations on the question of usury, it has been ruled that, unless the stock was a mere device to cover usury, payments made thereon should be applied to the stock agreeably to the stipulations of the parties. Cotton States Bldg. Co. v. Jones, 94 Tex. 497, 62 S. W. 741; International Bldg., etc., Association v. Abbott, 85 Tex. 220, 20 S. W. 118.

The assignment of error relating to attorney's fees next requires our attention. In respect of this assignment it is insisted by the appellant that by the terms of his contracts with the association attorney's fees matured only upon default made by him in the payment of interest, stock installments, and other dues, and that since he fully complied with the terms of his contracts during the life of the association such fees could not be properly charged against him. It is a principle generally, if not universally, admitted that when a building association becomes insolvent and goes into the hands of a receiver, the payment of stock dues, premiums, and fines ceases. See authorities above cited. Why, then, should attorney's fees be exacted? Should they not share the fate assigned to stock dues, premiums, and fines? The by-laws of building associations and the stipulations of parties procuring loans have in view, not insolvency, but success of the venture. And fines, forfeitures, and other penalties are imposed upon delinquent members, not chiefly to punish the offender, but rather for the more business-like purpose of encouraging promptness on the part of members in discharging their obligations, thereby assisting the association in its efforts to render the enterprise successful. But, when the scheme has failed, the fines and penalties can no longer be enforced. Nothing is left to be done but to marshal the assets, and it would be hard indeed on the member who had promptly met all engagements if he should be held to answer for the sins committed by others. But, tested by the engagements of the appellant as evidenced by his several contracts, the same result must follow. The fees were recoverable only upon the happening of the contingency, and the very contingency, as to which the parties had contracted. The contingency within the contemplation of the parties was default in the payment of interest and other dues by the appellant. But, as has been shown, he was not delinquent; he made no default; he promptly paid all demands against him. Hence, by the terms of his contract, he is relieved from the payment of attorney's fees. Discussing this question, it was said by Mr. Justice Brewer (now Associate Justice of the Supreme Court) in Jennings v. McKay, 19 Kan. 121:

"The allowance of attorney's fees in the foreclosure of a mortgage is based upon contract. Stover v. Johnnycake, 9 Kan. 367; Coburn v. Weed, 12 Kan. 182. The court can allow none, unless the mortgagor has stipulated to pay them, and can allow no more than he has stipulated to pay, and under no other circumstances than those under which he has stipulated to pay; in other words, the court can make no new contract for the parties. It simply enforces the contract already made."

See, also, In re Roche, 101 Fed. 956, 42 C. C. A. 115.

While we have not considered the specifications of error in the order of their arrangement by the appellant, it is thought that the discussion of the case embraces every material error assigned. The decree appealed from should be amended by eliminating the item of attorney's fees of $302.50 charged against the appellant, and, as amended, it should be affirmed.

Ordered accordingly.

McCORMICK, Circuit Judge, dissents.

(2) Franklin Opera House Company, Limited, v. Johnston Armstrong, Receiver.

MAXEY, District Judge. The controlling question involved in the present appeal is similar to the principal one decided in Gunby v. Armstrong, supra. In the two cases, however, the situation of the parties is somewhat different. Here the Franklin Opera House Company was purchaser of the property originally mortgaged by Mrs. De Long to the building association, and the bill was filed against it as vendee of the mortgagor. A brief recital of the facts will illustrate the status of the parties. In April, 1895, Mrs. Lucy De Long applied to the association for 50 shares of class B series stock, and the usual certificate was duly issued to her. She then made application for a loan of $5,000, and, the same having been granted, she executed on May 7th, following, by authority of her husband, her note to the association for the amount named, to wit, $5,000, payable 142 months after date, in New Orleans, La., with interest at the rate of 6 per cent. per annum from date until paid. The real estate upon which the lien was sought to be foreclosed by the appellee was by the usual sale and resale subjected to the vendor's privilege and special mortgage to secure payment of the note and the performance of Mrs. De Long's contracts with the association. After she had paid about 18 monthly installments of interest on the loan and a like number of monthly installments on the stock, she conveyed the property, November 2, 1896, to the appellant for the sum of $10,000, of which $5,630 was paid in cash; and in reference to the remainder the act of sale contained the following clause:

"The said purchasing corporation, or its agent, does hereby assume the payment of the balance due by said vendor on the mortgage note dated May 7, 1895, secured by the vendor's lien and special mortgage in favor of the New South Building & Loan Association, of New Orleans, Louisiana, bearing upon and affecting the property herein conveyed, which said balance is now computed at four thousand three hundred and seventy dollars ($4,370.00), and the payment whereof is assumed upon the terms contained in the act of sale from said building and loan association to the said Mrs. De Long."

The association was not a party to the act of sale entered into between Mrs. De Long and the appellant, and was ignorant of its existence until long after it had been consummated. Subsequent to the sale of the property by Mrs. De Long to the appellant, the latter paid to the building association and to the receiver $1,995, which was applied as follows: To the payment of interest on the loan, $875; to monthly installments on stock, $1,085; and to fines, $35. It also appears from the record that all stock installments were paid to the date of the receivership and all interest dues to October, 1899. Upon the hearing in the trial court, Mrs. De Long, who is not a party to the appeal, claimed to be the owner of the stock, and asserted its validity and her right to any dividends which might be ultimately declared thereon, while the appellant insisted that the installments of interest and stock dues paid by it, subsequent to its purchase of the property from Mrs. De Long, and by Mrs. De Long prior thereto, should be imputed to the loan, upon the following grounds: (1) That, as to the payments made subsequent to the purchase, it, not being the owner of the stock, should not be required to pay stock installments; and (2)

that the stock was a mere fiction and usurious device, and hence not valid as to either of the parties.

Touching the second reason assigned, we held in the Gunby Case that loan and stock contracts made by shareholders with the association were to be regarded as separate and distinct transactions, and that stock dues were attributable to the stock, and not as partial payments on the loan; and it was further held that the engagements entered into by the parties were valid obligations and binding upon them. If, then, the loan be free from usury and the stock valid as to the shareholder, it is not perceived how they could be otherwise considered when assailed by one who was a mere vendee of the property antecedently mortgaged to secure the loan; and certainly the plea of usury and of the invalidity of the stock should not be permitted to prevail in the present case, since Mrs. De Long, who made the note, subscribed for the stock, and executed the mortgage, was before the court earnestly insisting upon their fairness and validity.

As to the contention of counsel that the appellant was not the owner of Mrs. De Long's stock, and that consequently there was no obligation resting upon it to pay the installments, which had been applied by the association on stock dues, it may be said that the appellant assumed the payment of Mrs. De Long's note upon the terms contained in the act of sale entered into between her and the association, and, as that instrument retained a lien upon the property purchased by the appellant to secure the payment of all interest and stock installments, it would seem to be immaterial whether such installments were credited on the loan or imputed to the stock, since in any event they were chargeable against the property; and in order to relieve the property of the incumbrance voluntarily assumed by the appellant, and to acquire thereto complete title, it was necessarily compelled to pay the dues, whether they had been previously imputed in the one way or the other. In respect of the obligation assumed by the appellant, in the deed executed to it by Mrs. De Long, this case is readily distinguishable from Manor v. Aldrich, 126 Fed. 934, 61 C. C. A. 464, relied upon by its counsel; and hence that case is inapplicable to the one at bar.

In his statement of account the master, Mr. Kruttschnitt, charged the appellant and Mrs. De Long with the amount of the note, $5,000, together with 6 per cent. interest from October 1, 1899, and attorney's fees of 10 per cent. upon the amount of recovery. The total thus found was credited with the sum of $312 as an anticipatory dividend on the 50 shares of stock. In reference to the adjustment of the equities between Mrs. De Long and the appellant he reported as follows:

. "It is to be borne in mind, however, that whilst the association has, in my opinion, the undoubted right to recover the full sum of $5,000 and interest and attorney's fees as above stated, still the payment of that amount is secured, not only by mortgage on the opera house company's property, but also by pledge of Mrs. De Long's stock; and it is further to be borne in mind that she sold the property purchased by the opera house company for a price of $10,000, whereof she received in cash $5,630, and through some erroneous computation between herself and the company computed the balance due upon her mortgage note at only $4,370, instead of $5,000. It is further to be borne in mind that the Franklin Opera House Company has

paid the sum of $1,085 in installments on stock, which installments were se-, cured by mortgage on the property sold by Mrs. De Long to the company, and as to which the company did not assume her obligations. 'It would there-fore seem quite clear that under her warranty Mrs. De Long would be bound to the opera house company to the extent of $630 excess in the amount due on the mortgage note over the amount at which that indebtedness was computed in her act of sale to the opera house company, and for the further sum of $1,085, amount of installments paid by the Franklin Opera House Company on account of her indebtedness on her stock."

As affecting the issue between Mrs. De Long and the appellant, the decree passed by the court subrogated the latter to the rights of the association and of the appellee as pledgee of Mrs. De Long's stock, and ordered the sale of the stock to satisfy the sum of $1,715 adjudged in favor of the appellant against Mrs. De Long. After the most attentive consideration of the record, we are unable to conclude that the decree fails to protect the rights of the parties as fully as it was practicable to do in view of established facts. Error, however, was committed in charging the item of attorney's fees against the appellant. This question was considered in Gunby's Case, and what was there said need not be here repeated. In all other respects we are of the opinion that the record is free from prejudicial error.

The decree should be amended by eliminating the item of attorney's fees, and, as thus amended, it should be affirmed.

Ordered accordingly.

McCORMICK, Circuit Judge, dissents.